**D. Franklin WISHART, Plaintiff, Appellee and Appellant,**

v.

**Paul J. McDONALD et al., Defendants, Appellants and Appellees.**

**Nos. 74–1010, 74–1011.**

United States Court of Appeals, First Circuit.

Argued April 1, 1974.

Decided July 10, 1974.

Jeffrey M. Freedman, Boston, Mass., with whom Dan S. Chill and Brown, Rudnick, Freed & Gesmer, Boston, Mass., were on brief, for D. Franklin Wishart.

John H. Henn, Foley, Hoag & Eliot, Michael B. Elefante and Hemenway & Barnes, Boston, Mass., on brief for Civil Liberties Union of Mass., amicus curiae.

Richard A. Howard, Boston, Mass., with whom Brickley, Sears & Cole, Bos-

ton, Mass., was on brief, for Paul J. McDonald and others.

Austin Broadhurst, Philip S. Lapatin and Gaston, Snow, Ely & Bartlett, Boston, Mass., on brief for Mass. Ass'n of School Committees, amicus curiae.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

D. Franklin Wishart, a tenured sixth grade teacher in Easton, Massachusetts, was dismissed from his job for conduct unbecoming a teacher, following a hearing before the school committee on charges that he had carried in public view on his property located in the town where he taught, in a lewd and suggestive manner, a dress mannequin that he had dressed, undressed and caressed.

Instead of pursuing the *de novo* hearing available to him in the state court, *see* M.G.L. c. 71, § 42, he filed a federal action under 42 U.S.C. §§ 1983 and 1985. He has alleged that the individual defendants, among them the superintendent of schools Paul J. McDonald and the members of the Easton school committee, deprived him of constitutional rights by removing him arbitrarily and capriciously, by penalizing "private" conduct which did not interfere with his teaching duties, and by applying an unconstitutionally vague statute. He sought an injunction, an order directing reinstatement and payment of damages, and a declaratory judgment that the phrase "conduct unbecoming a teacher" in M.G.L. c. 71, § 42, was unconstitutionally vague. After a hearing on the request for a preliminary injunction, which by stipulation was consolidated with the trial on the merits, the district court ruled against Wishart. 367 F. Supp. 530 (D.Mass.1973). We affirm.

The evidence in the district court disclosed the following: Wishart, who taught for several years in another school system, was employed by the Easton system in September, 1968. He subsequently acquired tenure by operation of M.G.L. c. 71, § 41.[1] A tenured teacher "shall not be dismissed, except for inefficiency, incapacity, conduct unbecoming a teacher or superintendent, insubordination or other good cause, . . ." M.G.L. c. 71, § 42. That same section provides numerous procedural safeguards, none of which Wishart claims were denied to him: the teacher must be given 30 days' notice of the meeting of the school committee at which his discharge will be considered; charges against him must be in writing; he may be represented at the meeting by counsel and may call witnesses and present evidence; the superintendent must make a recommendation to the committee; and the committee must find that the charges brought against the teacher are "substantiated" before dismissing him. After dismissal, a teacher has 30 days in which to petition for a *de novo* hearing in the state's Superior Court, at which the committee must try to sustain its decision. If the court rules in favor of the teacher, he shall be reinstated "without loss of compensation." M.G.L. c. 71, § 43A. If the Superior Court agrees with the school committee, the teacher may appeal to the higher Massachusetts courts.

In the Easton schools Wishart received from his superiors ratings of slightly above average. In his last evaluation, in March 1972, his principal wrote that "Mr. Wishart is an excellent teacher. He has a genuine enthusiasm for pupils and teaching, making him a valuable member of the Middle School staff."

Sometime about the fall of 1971 Wishart began to engage in unusual conduct

---

1. M.G.L. c. 71, § 41 provides that "Every school committee, in electing a teacher . . . who has served in its public schools for the three previous consecutive school years, . . . shall employ him to serve at its discretion; . . ." A teacher serving at discretion is entitled to the safeguards of § 42.

which his psychiatrist testified was symptomatic of a personality disorder[2] characterized by the displacement of sexual interest into a dress. Occasionally until the spring of 1972, and weekly on Thursday evenings thereafter until March of 1973, Wishart took a mannequin outdoors and moved about his yard. The mannequin, according to Wishart, was a camera tripod to which he had strapped a pillow and covered with his wife's dress. His immediate neighbors, three of whom testified in court, thought the contraption was an actual mannequin, and that it was draped in a negligee. In any event, Wishart could be observed readily from nearby houses handling the mannequin at different places on his lot, including in his well illuminated front yard. Neighbors testified that they observed him caressing the mannequin in the area of the breast, and that once he had placed it on top of a car. One neighbor observed him lifting the skirt and placing it between his legs. Two neighbors thought they observed masturbation; he denied it. There was no testimony of actual exposure. Wishart testified that he did not think he was observed, but conceded that possibility. In fact he was regularly observed by the neighbors who paid considerable attention to these evening activities. Wishart's testimony to a desire to keep the conduct private was offset by testimony of neighbors that, in their opinion, he acted as if he wished to be seen. He did not stay inside; his property fronted on a well-travelled street; he carried out the activity in illuminated places; on one occasion he entered a neighbor's lot. There was abundant evidence from which it might be concluded both that he was observed and that he should have expected to be observed. There was also evidence that besides the three nearby neighbors who testified, other persons in Easton, a small town, became aware of the conduct. Superintendent McDonald testified that it had become such public knowledge that even prior to the dismissal it was being discussed among his wife's friends in another area of Easton. The school psychologist told Wishart in mid-December 1972 that she had been made aware of strange conduct taking place on his property. She offered help, which he refused. After stopping for two weeks, he recommenced the conduct.

One of Wishart's neighbors informed McDonald via a school committee member of Wishart's behavior. After speaking with another neighbor, McDonald went to Spooner Street one night and observed the conduct for himself from both across the street and the house next door. He observed from both locations as Wishart carried the contraption to the front, side and rear of his house.

McDonald met with Wishart after school on March 9, 1973, informing him orally and by letter that he was relieved of classroom duties and transferred to nonteaching duties; his compensation was continued pending a meeting of the school committee to decide whether he should be fired. Prior to March 9, McDonald had not advised Wishart that his conduct would be viewed as a cause for discharge.[3] On May 16, 1973, McDonald formally notified Wishart that he had been charged with "conduct unbecoming a teacher" pursuant to § 42, and that a discharge hearing would be

2. The psychiatrist, who testified in the district court but not before the school committee, said that the disorder "had its beginning in adolescence" but had been controlled successfully until the first child, born with a severe neurological deficit, had died about a month after its birth. Wishart then became depressed and commenced the behavior that led to his dismissal.

3. McDonald testified that he believed that he was forbidden by state law to inform Wishart of the possible consequences of his actions. This, of course, was a misreading of Massachusetts law. M.G.L. c. 71, § 42D states that no teacher shall be "interrogated" prior to any notice given him relative to a suspension hearing "unless he is notified of his right to be represented by counsel during any such investigation." It was not necessary to "interrogate" Wishart in order to inform him that his conduct was considered serious misbehavior.

held before the school committee. The letter made two particularized charges of "unbecoming" conduct:

"a. That you have on various occasions displayed and carried a dress mannequin in the public view on your Spooner Street property, have dressed said mannequin in feminine attire, and have on occasion caressed said mannequin.

"b. That your actions in the public view on your Spooner Street property in regard to the dressing and undressing of said dress mannequin in feminine attire have been on various occasions of a suggestive or lewd nature."

Wishart and his counsel attended the meeting on June 18 at which the school committee, after hearing the recommendation and testimony of McDonald, several neighbors, Wishart, and a police officer who had accompanied McDonald on his sojourn, voted unanimously to discharge Wishart. Wishart received his salary for the entire 1972–73 school year. The record on appeal does not include a transcript of that meeting, nor is it clear whether one was made. The school committee gave no reasons, other than those in the May 16 letter, for the discharge. McDonald testified at trial that he recommended Wishart's dismissal on the grounds that his conduct had become notorious in the town and that this would impair his ability to function as a sixth grade teacher, and, moreover, that Wishart's conduct indicated possible emotional instability unbefitting a teacher. Wishart's psychiatrist testified that Wishart's conduct was unrelated to his performance as a teacher and would not affect classroom conduct.

Wishart appeals from the rulings of the district court denying him relief on the merits and defendants appeal the court's denial of their motion to dismiss the complaint for failure to exhaust state remedies. The court found that under the standards set out in Drown v. Portsmouth School District, 451 F.2d 1106 (1st Cir. 1971), the action of the school committee was not arbitrary or capricious. Because Wishart admitted engaging in the conduct with which he was charged, the district court reasoned, the only open question was whether the reasons given were related to the educational process. The court noted the uncontradicted testimony of Wishart's psychiatrist that his personality disorder would have no effect on classroom performance, and observed that Wishart's teacher evaluations (including one filed after his public conduct had commenced), rated him generally above average to excellent. But the court wrote:

"Even if the Court were to agree (which it is not altogether prepared to do), that plaintiff's problem would in no way reflect on his performance in the classroom, there is still the problem of notoriety and its effect on 'relationships within the educational process.' The extent of the pre-March 9 notoriety of plaintiff's conduct is uncertain as is the extent of the notoriety to date. . . . The Court feels that there was a basis, if somewhat meager, for McDonald's belief that the conduct had, or certainly would in the future, gain a degree of notoriety which would damage plaintiff's effectiveness as a teacher in the school system and his working relationships within the educational process. It cannot be said that the school committee ·acted arbitrarily or capriciously in sharing in that opinion and following the recommendation to dismiss. Whether or not some of the notoriety·was caused by the defendants' investigations and hearings cannot change that result." 367 F.Supp. at 535.

The court also rejected Wishart's contention that the school committee was punishing him for constitutionally protected "private" conduct. The court agreed with plaintiff that the conduct occurred on his "private property" but refused to equate "on private property" with "in private". The district court was correct on this point. The right of privacy, even as advocated in Warren & Brandeis, The Right to Priva-

cy, 4 Harv.L.Rev. 193 (1890), may be surrendered by public display. The right to be left alone in the home extends only to the home and not to conduct displayed under the street lamp on the front lawn. *Compare* Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), *with* Paris Adult Theatre I v. Slaton, 413 U.S. 49, 65–67, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). *See generally* W. Prosser, The Law of Torts § 117 (4th ed. 1971).

■ Finally, the district court declined to decide Wishart's contention that the standard of "conduct unbecoming a teacher" is unconstitutionally vague. The court wrote:

"Whether or not this is a determination which can be made by a single judge is questionable and whether or not it belongs in the federal court at all in the first instance is even more questionable. The statute could easily be interpreted by the state court to refer only to conduct which is job related. Such a construction would most probably save the statute from being attacked as vague." 367 F. Supp. at 536.

The district court should, we think, have decided the vagueness issue. Wishart had requested only a declaratory judgment that the statute was too vague; a single judge may enter a declaratory judgment. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). Unless the specific factors favoring *Pullman* abstention are present, *see* Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 1805 n. 5, 40 L.Ed.2d 224 (1974); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct.

1316, 12 L.Ed.2d 377 (1964), a vagueness challenge to a state law does not call for abstention; a plaintiff is entitled to the forum of his choice. In the instant case abstention seems inappropriate. The Massachusetts court, after opportunity to interpret the statute, has shown no inclination to narrow its meaning. *See* MacKenzie v. School Committee, 342 Mass. 612, 174 N.E.2d 657 (1961).

There are, then, three issues for our decision: first, was Wishart required to exhaust his state judicial remedies; second, was the dismissal arbitrary or capricious within the meaning of *Drown*; and third, was the dismissal predicated on a statute too vague to afford notice of the prohibited conduct?

## EXHAUSTION

■■ Although Wishart was entitled to a *de novo* hearing in a state court, he was not required to exhaust the state remedies before coming into federal court. The federal remedy is separate, and supplements the state remedy. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1963); Palmigiano v. Mullen, 491 F.2d 978 (1st Cir. 1974); Raper v. Lucey, 488 F.2d 748, 751 n. 3 (1st Cir. 1973).[4] Even though exhaustion of judicial remedies is not required, nonexhaustion can be costly both to the parties and to the dual court system that characterizes our federalism. A § 1983 plaintiff could submit his case voluntarily to the state courts, while reserving the federal constitutional issues under the doctrine of England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Thus he could litigate his claim

4. This is not to say that a plaintiff in a § 1983 action is never required to utilize state judicial remedies. The Supreme Court has recently held in Dillard v. Industrial Commission, 416 U.S. 783, 94 S.Ct. 2028, 40 L. Ed.2d 540 (U.S. May 15, 1974), that a § 1983 plaintiff must use any "automatic" state judicial remedy that would entirely avert the harm of which he complains. Plainly, however, the *de novo* Superior Court suit was not of this type. Under

some conditions, moreover, an aggrieved party might be required to use speedy and effective administrative procedures that might avert the harm before it occurs. Gibson v. Berryhill, 411 U.S. 564, 574–575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); Blanton v. State University, 489 F.2d 377, 382–384 (2d Cir. 1973). However, we cannot say that Wishart is required to do more than he has done.

that the school committee's findings were erroneous, and receive as well an authoritative construction of the state statute. This course might be particularly appropriate where the state judicial hearing is *de novo;* Wishart would seek not some restrictive "review" in state court, but would receive an entirely new hearing at which the school committee has the burden of supporting the discharge. State courts alone can limit the meaning or operation of the state statute. It may be that the state courts would declare that the statute does not authorize dismissal for conduct of the sort engaged in by Wishart. The state might set up evidentiary standards that the school committee would have to meet in order to demonstrate the relationship of Wishart's conduct to some detriment to the educational policy. We can do neither.

Perhaps more important for most § 1983 plaintiffs, the state Superior Court's offer of *de novo* factual hearing, with appellate review for "error", cannot be duplicated in the federal court. Our system is far more tolerant; we seek not "error" but flaws of constitutional magnitude. Palmigiano v. Mullen, 491 F.2d 978, 980 (1st Cir. 1974). We will leave the state's decision and action alone even though we believe its assessment of the facts, and its judgment about the impact of those facts on the educational system, to be in error. The Constitution is not a shield against error of the ordinary sort. The § 1983 plaintiff must be prepared to show that he has been acted against for a constitutionally prohibited reason, or under a constitutionally repugnant standard, or for no reason whatsoever. He does not prevail here if he can show only that he was dismissed from a job because the reason was not "weighty" enough to support "industrial capital punishment."

### ARBITRARY AND CAPRICIOUS ACTION

Wishart attempts to bring himself within our narrow scope of review by claiming that the school committee

has acted arbitrarily and capriciously. In Drown v. Portsmouth School District, 451 F.2d 1106 (1st Cir. 1971), we held that dismissal of a school teacher could be arbitrary and capricious in any of three ways. The reason given to support the dismissal might be "trivial", but our review would be limited to "egregious cases". This standard does not govern here—Wishart's conduct was not trivial and the school committee's action is not egregious. A second way would arise if the school committee's actions were "wholly unsupported" by facts. Again this standard does not govern here. Many facts are undisputed, and there is substantial evidence supporting the reasons advanced by the Superintendent for discharge. The adequacy of the school committee's hearing is not challenged and, to the extent there are material differences of fact, the committee was entitled to resolve the differences in a way that most fully supports the action it took.

The most persuasive argument that the dismissal was arbitrary or capricious is that the reasons for the dismissal are "unrelated to the educational process or to [the] working relationships within the educational institution." *Drown, supra* at 1108. But we think fair minded men could reasonably dispute whether public conduct and a "personality disorder" of the sort described by Wishart's psychiatrist are "related" to the educational process, especially in the case of a small town elementary school teacher. Precisely because the question could be disputed, we should not overturn the action of the school committee on constitutional grounds, whatever our own preferences. We have no doubt that the conduct would seem sufficiently bizarre and threatening so that, in the minds of many, it would destroy his ability to serve as a role-model for young children. This may be an overly strict view, and it may be that Wishart's abilities and future could both be preserved by a more tolerant and understanding course. But this is the sort of judgment a school committee is elect-

ed to make, and the committee is entitled to prevail unless plainly wrong.[5] If the cause for dismissal were speech or some other constitutionally protected activity, the matter would be entirely different. Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969).

> "If [the defendants] acted in good faith, treating the suspension as a matter of ordinary procedure, even if they might be thought to have been over-demanding, plaintiff has no federal claim." Moran v. Bench, 353 F.2d 193, 194 (1st Cir. 1965), cert. denied, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966).

Cf. Acanfora v. Board of Education, 491 F.2d 498 (4th Cir. 1974).

## VAGUENESS

Wishart's vagueness challenge is foreclosed by Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15 (1974). Although the plurality opinion spoke for only three justices, Justices Powell and Blackmun, and Justice White, indicated in their separate opinions that they joined the plurality's treatment of the vagueness issue.[6]

The only argument that might be made to distinguish Arnett, which found that "such cause as will promote the efficiency of the service" was not too vague, is that the federal employees there had the benefit of a personnel manual adding some flesh to the bones of the statute, and that the general counsel of the agency stood ready to construe the statute for the employees in advance of any possibly offending behavior. Cf. Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); CSC v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). We do not find the difference material. The Federal Personnel Manual referred to in Arnett included the following "specifics":

> "Basically a 'cause' for disciplinary adverse action is a recognizable offense against the employer-employee relationship. Causes for adverse action run the gamut of offenses against the employer-employee relationship, including inadequate performance of duties and improper conduct on or off the job. . . ."

This added nothing of value to the statutory standard except to give notice of its enormous breadth. Nor do we find the availability of counsel significant when, in Wishart's case, there is no indication that the sort of conduct in which he engaged is one for which he was apt to seek legal advice.

If the conduct had been so inoffensive —such as not wearing a tie—that a teacher might not be aware of the prevailing standard, we would require evidence that the required standard had been communicated, and that the teacher had nonetheless refused to adhere. In such a case, persistent failure to wear a tie would be less itself conduct unbecoming a teacher than it woud be evidence of a more serious refusal to follow a reasonable and express rule. But we cannot say that Wishart's behavior was not fairly identifiable in advance as conduct unbecoming a teacher. True it was probably not criminal, nor was it seriously disruptive. But we think it was sufficiently odd and suggestive that the ordinary person would know, in advance, that his image as an elementary school teacher would be gravely jeopardized.[7]

---

5. We think those cases imposing more stringent standards of job-relatedness, in which the court substantially substitutes its judgment for that of the hiring and firing authority, can be explained either as instances in which the criterion used was constitutionally forbidden, such as speech or privacy, or cases in which federal courts were able to use the more expansive Administrative Procedure Act to review the acts of federal agencies under federal statutes. See, e. g.,

Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969); Mindel v. CSC, 312 F.Supp. 485 (N.D.Cal.1970).

6. Cf. Mailloux v. Kiley, 448 F.2d 1242 (1st Cir. 1971). To the extent Mailloux is inconsistent with Arnett, the latter obviously governs.

7. This would be a different case if the cause for dismissal were speech or another constitutionally protected activity, even one con-

Similarly, there was no warning in *Arnett*. Humanly it is perhaps unfortunate that there was no warning; on the other hand, the message of the school psychologist in December can be described as a guarded warning which Wishart chose to ignore or at least was unable to do anything about.

 The choice between specific rules and general standards is a difficult one; each has its unique costs. *See generally* Ehrlich & Posner, An Economic Analysis of Legal Rulemaking, 3 J. Legal Studies 257 (1974). The real safeguard under a general standard is the common-law adjudicatory process coupled with judicial review. *See* NLRB v. Bell Aerospace Co. Division, 416 U.S. 267, 94 S.Ct. 1757, 1770–1772, 40 L.Ed.2d 134 (1974). That administrative and adjudicatory process is present here and we hold that the statutory standard is not unconstitutional. *Cf.* In re Bithony, 486 F.2d 319 (1st Cir. 1973).

Affirmed.

Opinion vacated Nov. 27, 1974. See 504 F.2d 1380.

sidered "odd or suggestive" by the community. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 603–605, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

