**Duane P. BRASSLETT, Plaintiff, Appellant,**

v.

**Raymond J. COTA, Jr., et al., Defendants, Appellees.**

**No. 84–1555.**

United States Court of Appeals, First Circuit.

Heard Feb. 9, 1985.

Decided May 16, 1985.

---

Theodore S. Curtis, Jr., Orono, Me., with whom Curtis & Griffin, Orono, Me., was on brief, for plaintiff, appellant.

Andrew M. Mead, Bangor, Me., with whom Mitchell & Stearns, Bangor, Me., was on brief, for defendants, appellees.

Before TORRUELLA and ALDRICH, Circuit Judges, and PETTINE,* Senior District Judge.

* Of the District of Rhode Island, sitting by desig-

PETTINE, Senior District Judge.

The action now on appeal before this court was instituted by Duane Brasslett, former fire chief of the Town of Orono, Maine. Brasslett sued the Town and the Town Manager, Raymond J. Cota, Jr., for violations of 42 U.S.C. § 1983. He alleged that the Town, through the action of the Manager, unlawfully discharged him in violation of his rights under the First Amendment to the United States Constitution when it terminated him in retaliation for remarks he made during a television interview. He also claimed the defendants violated his rights under the due process and equal protection clauses of the Fourteenth Amendment and various provisions of state law. Brasslett sought declaratory and injunctive relief, reinstatement as fire chief, damages, and attorney's fees pursuant to 42 U.S.C. § 1988. Counsel for both parties agreed to submit the case to the trial judge for decision on the merits based on a closed documentary record. The judge subsequently issued a memorandum decision rejecting each of the plaintiff's legal claims. *Brasslett v. Cota et al.*, C.A. No. 83–0007–B [Memorandum Opinion]. Brasslett now appeals those rulings. We reverse the district court's decision on the plaintiff's First Amendment claim and hold that the defendants, in discharging Brasslett from his position as fire chief, unlawfully retaliated against him for exercising his First Amendment rights to free speech.

### THE FACTS

Because the rather lengthy facts of this case are critical to our disposition on appeal, we must recount them in some detail.

The defendant/appellee Town of Orono is a political subdivision of the state of Maine which operates under a council-manager form of government. The Town Council [Council] is a legislative body consisting of seven council members elected to staggered terms. The Town Manager [Manager] is appointed by the Council and enjoys considerable authority to manage town af-

nation.

fairs. Defendant/appellee Raymond J. Cota, Jr. is presently the Town Manager of Orono, and held that office at all times relevant to this case.

The administration of the Town's personnel system is one of the primary responsibilities of the Town Manager. The Town government is divided into a number of departments. The Manager appoints department heads to indefinite terms of employment, subject to approval by the Council. The Town Charter authorizes the Manager to discipline all supervisory personnel, and to remove department heads for cause. It contains a set of personnel rules and regulations which delineates types of employee conduct constituting "sufficient cause for disciplinary action." These rules include ten rather specific grounds for discipline as well as an eleventh more general provision authorizing personnel action in "any other such instance or situation of such seriousness that disciplinary action is considered warranted."

A town employee who is discharged pursuant to these regulations is entitled under the Charter to a written statement of reasons for dismissal. In addition, the employee may challenge the decision through certain established grievance procedures. After attempting informally to resolve the grievance with the Town Manager, the employee may seek review of the action by the Personnel Appeals Board [Appeals Board].[1] After hearing the appeal, the Appeals Board issues a recommendation for remedial action to the Town Manager. The Manager's decision whether to follow the recommendation is discretionary and shall be final.

On December 3, 1979, the Manager appointed the plaintiff/appellant Duane Brasslett to the position of Town Fire Chief. Brasslett served Orono in that capacity until the Manager discharged him on December 14, 1982. During his tenure, Brasslett's work as a fireman was commendable. The district court, however, discussed three particular incidents at length,

which cast a more negative light on Brasslett's job performance. These incidents are relevant to the Town Manager's motivation for ultimately terminating the plaintiff.

First, during August of 1982, the Manager suspended Brasslett for thirty days for transferring property to a private individual without using a competitive bidding process and for conduct unbecoming a public official. Specifically, Brasslett had sold a city owned pick-up truck to a private party and neglected to account for the proceeds for a period of approximately five weeks following the sale. Brasslett appealed the suspension to the Appeals Board, which recommended that the Manager reduce the term of the suspension to fifteen days. The Manager followed that recommendation.

The second incident occurred around June 15, 1982, when Chief Brasslett authorized a fireman to remove a nonoperational department owned jeep to the fireman's residence to attempt repairs at no cost to the town. After a council member informed the Manager that the jeep had been seen elsewhere in town, the Manager requested an explanation from Brasslett. Brasslett responded through a memorandum stating that a fireman was repairing the jeep in his garage. The Manager made a notation on the memo asking Brasslett to keep him posted on the status of the jeep, since "past history would indicate this is a sensitive issue." Brasslett later returned the jeep to the town garage at the Manager's request, but the incident did not result in any disciplinary action against the Fire Chief.

The final incident is the primary focus of the instant lawsuit, which the plaintiff asserts was the impetus for his discharge. On December 4, 1982, Chief Brasslett granted a television interview to a local station to discuss Orono's fire fighting capabilities. The station requested the interview after hearing from an anonymous phone caller on December 3, that the town

---

1. The Personnel Appeals Board consists of three members appointed by the Town Council for a three year term. Charter of the Town of Orono, § 1, 3. 13(A).

had only one operational fire truck. The interview was conducted at the fire station where the plaintiff appeared in dress uniform. The interviewer extensively edited the actual interview prior to its broadcast and the deleted portions are no longer available. The following is the actual text of the broadcast version:

*Barbara Bousquet:* Friday night, the rear end dropped out of Orono's eighteen year old pumper truck. It was responding to a chemical fire at the University of Maine. Fire Chief Brasslett says it's the latest in a series of problems.

*Chief Duane Brasslett:* Well, right now, we've got two of 'em out of service; this particular truck, which is our lead truck, has been out of service for four weeks, and it has multiple problems; it's got a cracked frame, it's got power steering unit problems, it's got rear end spring problems.

*Bousquet:* How much did this cost when you bought it?

*Chief Brasslett:* Thirty Thousand Five Hundred.

*Bousquet:* And how much have you put into it in repairs?

*Chief Brasslett:* We've put Twenty Thousand dollars in repairs in the last twelve years; that's just major repairs; another Eighteen Thousand Dollars in minor maintenance on it such as gauges, lines, other things like that.

*Bousquet:* Two of Orono's three pumper trucks were bought new; the third, a tanker and an aerial ladder truck were bought used. Brasslett says a major problem is that the Town buys trucks at the lowest cost, and usually not equipped with the specifications Brasslett needs. As a result, the trucks fall apart rapidly. Right now, what does the Town of Orono have for fire protection?

*Chief Brasslett:* A 1959 Ford, Front mount pump.

*Bousquet:* That's it?

*Chief Brasslett:* That's it.

2. The text of that interview is as follows:

*Bousquet:* Brasslett has used up his Five Thousand Dollars maintenance budget for this year and a Two Thousand Dollar emergency loan from the City. Last night Brasslett advised city manager Ray Cota of the latest breakdown. Cota said he would get a mechanic to work on the truck on Monday. Brasslett says repairs are costly and usually take weeks because of the lack of parts for older model trucks. Chief Brasslett hopes a special Council meeting will be called this Monday or Tuesday to vote on emergency funding to buy a new fire truck. If that meeting is not held, the next regular Council meeting will be held on December Thirteenth. Despite either of these meetings, Brasslett says there will be no quick cure. In Orono, I'm Barbara Bousquet, News Center.

Prior to the interview, two firemen had placed signs bearing the word "Sunkist" on one of the two disabled fire trucks in the station. Those signs appeared on the broadcast of the · interview. Brasslett claimed that he had asked the interviewer not to film the signs. The cameraman could not recall the fire chief making such a request, and the interviewer expressly denied it. The cameraman did claim that he asked Brasslett whether he wanted the signs removed during the interview and that Brasslett simply did not respond.

The day after the interview was aired, the Chairman of the Town Council telephoned the Town Manager to inquire about the status of the Town's fire equipment. At this time, the Manager had not yet seen the interview. The district court found that the Town ·Manager thereafter received several unfavorable comments about the broadcast, and consequently went to the television station to personally view the tape. To address the growing public concern over Orono's fire fighting capabilities, he requested the station to conduct a second interview on that topic. Both the Manager and Brasslett participated in that interview, which was broadcast on December 8, 1982.[2]

TRANSCRIPT OF INTERVIEW with Town

In light of the adverse publicity generated by the first interview, the Manager requested the fire chief to submit a letter of apology to him. Brasslett wrote a formal letter apologizing for the unfavorable publicity and expressing his concern for the safety of his firemen. He further stated that the "Sunkist" signs were intended as a joke, and were not intended to be seen by the public, much less the media.

On December 13, 1982, the town council met in executive session to discuss both the Town's fire fighting capacity and Brasslett's status as fire chief. The seven Council members, the Town Manager, and Brasslett all attended the meeting. In an "informal and nonadversarial atmosphere" the Council members initiated a general discussion and addressed some questions to Brasslett. During the meeting, at least two Councilors expressed dissatisfaction with the remarks the plaintiff made during

Manager Ray Cota and Fire Chief Duane Brasslett by Don Carrigan, WLBZ–TV (Channel Two) Broadcast Wednesday, December 8, 1982.

*Don Carrigan:* Last weekend, this fire truck was out of service. It had a noise in the rear end which was not diagnosed until Monday. A report that Orono had only one working pumper truck caused concern in Town. The rear end problem apparently was not too serious, and the truck is now back in service. Orono still has one Fire Truck broken down. But Fire Chief Duane Brasslett and Town Manager Ray Cota told News Center today that Orono citizens still had adequate fire protection.

*Carrigan:* Do you have enough equipment to respond adequately to most situations?

*Chief Brasslett:* Yes, we have enough equipment to respond adequately to most situations.

*Town Manager Cota:* We have adequate protection; I'm not sure that it's ah, ah, where it should be, obviously, but ah, we certainly have two pumpers that are operational; we have the ladder truck that's operational; we also have the ah, ah, ah mutual aid pacts with the different communities in the surrounding areas; ah, University of Maine, Old Town, Bangor, Veazie, ah Glenburn, so that we have ah adequate protection ah under the situation.

*Carrigan:* Orono still needs another Fire Truck. The council is now looking over specifications. Cota and Brasslett hope a decision on purchase of a new truck is made fairly soon. In the meantime, they say there is enough equipment to do the job.

the December 4 interview. The Council asked the Manager if he was considering taking disciplinary action against the fire chief. The Manager responded that he would need to study the matter further before making any such decisions.

One day later, after reviewing a tape of the December 4 interview and the materials in Brasslett's personnel file, the Manager met with Brasslett for approximately one hour. The two men discussed past incidents of misconduct as well as the recent interview. The Manager raised possible disciplinary actions that might be taken against the plaintiff, including forced resignation or dismissal. At the close of the meeting, the Manager informed Brasslett that he would be dismissed. The following day, the Orono police chief delivered a formal termination letter from the Town Manager to Brasslett stating the reasons for the dismissal [3] and informing him of his

3. The text of the dismissal letter is as follows:
TO: Duane Brasslett
FROM: Raymond J. Cota, Jr.
SUBJECT: Termination

It has become increasingly apparent that you do not have the confidence of the Town Council, a number of department heads or myself. Your judgment on two occasions in the past two months has caused a great deal of embarrassment not only to myself, but to the fire department and to the community.

The initial incident concerned a jeep which was taken out of service, placed in the rear of the fire station and then was towed to a fireman's home in another community. That action was accomplished without my prior knowledge and while I was out of town. Further, my initial information that the vehicle had been removed came from a source other than yourself.

The most recent incident and one that causes the most concern, was a television interview which occurred on December 4, 1982. In that interview, you responded to a question concerning fire protection by stating that only one piece of equipment, a 1959 pumper, was available for protection. That statement was misleading and caused a great deal of concern in the community. In fact, not only was the 1959 pumper available, but also the 1965 Dodge Pumper and the ladder truck. Not only was that equipment available, but also our mutual aid agreements were in force. Further, signs of a derogatory nature were placed on a piece of equipment and filmed. These signs were not removed from said

option to invoke the Town's grievance procedure.

The plaintiff appealed the dismissal to the Town Board of Appeals. He received a public hearing on December 28, 1982, at which he was represented by counsel. Both the plaintiff and the Town Manager were permitted to present evidence and argue on behalf of their respective positions. The following day, without stating their reasoning, the Board recommended that the Town Manager reinstate Brasslett and consider other more lenient disciplinary alternatives. On December 31, 1982, after receiving input from several counsel members and department heads who had no confidence in Brasslett, the Manager summarily informed the plaintiff by letter that his dismissal would remain in effect.

## FINDINGS OF THE DISTRICT COURT

### A. Procedural Due Process

The plaintiff argued below that in discharging him from his position as Fire Chief, the Town and the Manager deprived him of his right to procedural due process as guaranteed by the Fourteenth Amendment. All parties having agreed that the plaintiff held a constitutionally cognizable property interest in continued employment, the district court had only to decide whether the Town had afforded Brasslett sufficient procedural safeguards. The plaintiff asserted two procedural infirmities. First,

he claimed that the procedure he received was inadequate since it did not include a pretermination hearing. Second, he contended that the hearing he did receive lacked the requisite fairness for want of an impartial decisionmaker. Because the recommendation of the Board of Appeals was merely advisory, he argued, the Manager impermissibly served as "prosecutor, judge, and jury."

The district court rejected each of these arguments. It found that while a pretermination hearing may be presumed appropriate in most cases, the interests of the Town in this particular situation justified immediate termination of the Fire Chief. It held that between the one hour pretermination conference and the Town's grievance mechanisms, Brasslett was afforded constitutionally sufficient procedure. In addition, it rejected the plaintiff's argument that the Appeal was flawed for lack of an impartial decisionmaker on the ground that Brasslett had failed to demonstrate that Cota was in fact biased against him.

The plaintiff also argued that the town ordinance invoked to dismiss him was void for vagueness under the due process clause of the Fourteenth Amendment. The plaintiff was discharged pursuant to the Charter's general disciplinary provision permitting personnel action in situations of such

---

equipment until Monday afternoon [two days later]. Although not directly responsible for the signs, not ordering their immediate removal infers your tacit approval.

You further implied that Council has not provided you with the proper equipment necessary to carry out fire suppression functions. That is a blatant misrepresentation of fact. When requested, Council has provided you with a tank truck and with additional funds in your vehicle repair account. They have been very supportive of the department's training needs.

Also, when I asked you to discipline the two individuals responsible for the signs, I was not informed as to the type of disciplinary action taken. I did receive an apology from each individual, but in neither instance was it mentioned exactly what type of disciplinary action had occurred.

I cannot understand the motive for your actions. You have caused a great deal of

embarrassment to this community. Fellow department heads have been forced to answer for your statements. Town Council members have received numerous telephone calls concerning a situation which was not truly reflective of the conditions and were unjustly publicly and privately criticized for inaction.

Because of these incidents and because your credibility has dissolved, I have no choice but to dismiss you, effective immediately. You will be paid for actual time worked. As grounds for dismissal, I cite the Personnel Rules and Regulations, 1.3.12. [C.11.].

You are aware of the grievance procedure, specifically section 1.3.15. [A], and section 1.3.16.

Sincerely,
Raymond J. Cota, Jr.
Town Manager

seriousness that "disciplinary action appears warranted." The district court summarily dismissed the vagueness claim, citing authority from this court. It commented that the Charter's "catch-all" provision was "not so indefinite that men of common intelligence must necessarily guess at its meaning and differ as to its application." Memorandum Opinion, p. 8, n. 8.

### B. First Amendment Claim

The plaintiff next argued that his discharge constituted unlawful retaliation against him for exercising his First Amendment right to free speech. The district court rejected this claim on several alternate grounds. The court's first line of analysis turned on the legal proposition that a public employee may not claim First Amendment protection for false statements of fact which are knowingly or recklessly made. The court concluded that the record contained more than ample evidence that Brasslett realized several of the statements he made during the December 4 interview were false, "or that he subjectively entertained serious doubts as to the truth or falsity of his statements." Memorandum Opinion at 23, citing New York Times v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

The court first found that Brasslett's statements regarding available fire protection were malicious. During the interview, Brasslett had responded to two questions regarding Orono's fire protection. Specifically, the interviewer, Barbara Bousquet, had inquired, "Right now, what does the Town of Orono have for fire protection?" Brasslett answered, "A 1959 Ford, Front mount pump." Bousquet asked, "That's it?" and Brasslett said, "That's it." The district court found those two statements were recklessly or knowingly false for two reasons.

First, it observed that the Town of Orono had entered into mutual aid pacts with nearby municipalities, whereby towns agree to render fire fighting assistance to neighbors whose capabilities are inadequate to control a fire in progress. Because Brasslett, as Fire Chief, was aware of these pacts, the court concluded that his failure to allude to them during the interview was deliberately misleading. Brasslett defended his omission of the mutual aid pacts from that particular response, stating that he had described them to Bousquet previously during the interview, as well as during a pre-interview briefing. The court discounted his explanation because it was inconsistent with the recollections of the interviewer and the cameraman.

The district court also held that Brasslett's responses were reckless based on its finding that at the time of the interview, Brasslett knew that the town in fact had at its disposal two operational pumper trucks and a ladder truck. Of the three pumper trucks, one was out of service and another had developed a rear end "noise" on the evening of December 3. Brasslett had reported the problem to the Town Manager that evening, and after discussing the matter, the two men agreed that the truck could be driven to a fire "in the exercise of reasonable caution." Memorandum Opinion, p. 24. The pumper was repaired within four days.

Next, the district court found that Brasslett's statements to the interviewer regarding the Council's action on specifications for and purchase of a new truck were recklessly false. The court acknowledged that the Council had not yet officially acted on the purchase of a new truck. It deemed it significant, however, that the Council had approved Brasslett's most recent specifications and was about to obtain bids on a truck, and that Brasslett was aware of these facts at the time of the interview.

The district court next concluded that even if Brasslett's statements were merely negligently false, they were not constitutionally protected speech. Applying a balancing test formulated by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), it sought to balance " 'the interests

of the [employee], as citizen, in commenting on matters of public .concern[,] and the interests of the [Town], as an employer, in promoting the efficiency of the public service it performs through its employees.' " [4] Memorandum Opinion, p. 18, *quoting Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. The court found that because of the close knit structure of the Town government, it was crucial to its efficient administration for the Town Manager to maintain a close working relationship with his department heads, including the fire chief. Such a relationship would necessarily require mutual confidence and a degree of personal loyalty. The District Court concluded that the plaintiff's remarks during the interview had eroded the working relationship between himself and the Manager, thereby justifying his discharge.

To support this conclusion, the judge reasoned that the Manager was entitled to expect his department heads, when presenting facts to the public in their official capacity, would present those facts correctly. Brasslett's failure to do so during the interview could reasonably undermine the Manger's confidence in him. In addition, the court found that the plaintiff's public statements created an artificial crisis in the eyes of the public and the Town Council. This disruption required the Manager to address a memorandum to the Council and to arrange a second television interview to correct the misapprehensions caused by the remarks. The court concluded that the disruption "diminished considerably the trust · and confidence the town manager was able and willing to place in the plaintiff...." Memorandum Opinion, p. 28–29.

Finally, the district court held that even if Brasslett's speech were protected under a *Pickering* analysis, and in addition was indeed a substantial or motivating factor in Brasslett's dismissal, the discharge should still be upheld. It found that the· defendants had demonstrated by a preponderance of the evidence, as required by *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), that Brasslett would have been dismissed absent the protected speech. The court indicated that the pickup truck incident, for which the plaintiff had previously been disciplined, was an important factor in the Town Manager's decision since absent that incident, the manager would have suspended rather than dismissed Brasslett.[5] Primarily, however, the court justified its conclusion on a finding that "the episode involving the Sunkist signs and the plaintiff's failure to discipline the firemen responsible, as well as plaintiff's knowing and false interview statements, provide adequate support for defendants' contention that the town manager would have reached the same decision as to plaintiff's dismissal in the absence of any protected speech." Memorandum Opinion, p. 31–32.

OUR REVIEW

*A. Procedural Due Process Claims*

The plaintiff argues on appeal that the Town discharged him without affording him due process of law, in part because it failed to provide him with a pretermination evidentiary hearing. The district court made the explicit finding that Brasslett's dismissal occurred on December 14 following the meeting between Brasslett and Cota, rather than on December 31 when Manager Cota reaffirmed his prior deci-

---

**4.** The court also stated that it was undertaking this additional analysis "because some of the plaintiff's remarks during the interview were correct....." Memorandum Opinion, p. 25. We believe that under *Pickering*, correct statements of public concern made by a public employee are protected unless very unusual circumstances are shown, such as the fact that the employee holds a position "in public employment in which the relationship between superior and

subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." *Pickering*, 391 U.S. at 570, n. 3, 88 S.Ct. at 1735, n. 3.

**5.** The district court properly noted that the Town could not invoke the jeep incident, for which no disciplinary action was ever taken, to justify Brasslett's dismissal.

sion.[6] Since the Appeals Board met on December 28, it is clear that Brasslett indeed did not receive a full pretermination hearing. The questions before us, therefore, are whether the plaintiff was entitled to a preterrmination evidentiary hearing, and if he was not, did he receive the minimum process due him under the Fourteenth Amendment.

In *Cleveland Board of Education v. Loudermill,* —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the United States Supreme Court recently delineated the scope of pretermination procedures that are due public employees. Recognizing that "the root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest," *id.* at ——, 105 S.Ct. at 1493, quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971), the Court held that an employee holding such an interest in his employment must be afforded "some kind of a hearing" before he may be discharged. *Loudermill,* —— U.S. at ——, 105 S.Ct. at 1493. A balancing of the competing interests at stake in employment termination cases compels a conclusion that some form of pretermination hearing is required in all such cases. *Id.*[7]

The Court went on to hold, however, that the required hearing need not be elab-

orate. The specific procedural requirements are to be determined with reference to the interests involved and the availability and extent of post-termination review. When a discharged employee may receive a post-termination hearing to review adverse personnel action, the pretermination hearing need only be extensive enough to guard against mistaken decisions. Accordingly, a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at ——, 105 S.Ct. at 1495.[8]

We believe that *Loudermill* is dispositive of the plaintiff's procedural due process argument. In his one hour conference with Manager Cota, Brasslett was notified of the possibility of discharge and was afforded an ample opportunity to defend his actions and rebut any erroneous allegations. Accordingly, we uphold the district court's finding on this issue.

We next turn to the plaintiff's argument that the hearing before the Appeals Board did not satisfy the due process requirement of a meaningful opportunity to be heard. He contends that because the recommendation of the Appeals Board was merely advisory, the evidentiary hearing on which it was based is a nullity. Consequently he argues that the fact that the

---

**6.** This finding is of special relevance since the defendants argued below that because upon a favorable Appeals decision, the plaintiff's backpay and benefits would have been retroactively restored, the Appeals Board hearing was, in effect, a pretermination hearing.

**7.** In arriving at its conclusion, the Court weighed the relevant interests as defined in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The pertinent considerations are the employee's private interest in retaining his employment, the government's interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of erroneous termination. *Id.*

The Court in *Loudermill* clearly reiterated its rejection of the oft cited plurality opinion in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), which advanced the proposition that a public employee's property inter-

est in his employment is circumscribed by the deprivation procedures prescribed by the government. *See Arnett,* 416 U.S. at 153, 94 S.Ct. at 1644.

**8.** The Court noted that the only case in which it had previously held that a full evidentiary pretermination hearing was constitutionally required was *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). *Loudermill,* —— U.S. at ——, 105 S.Ct. at 1495. The Court in *Goldberg* had pointed out, however, that that case presented entirely different considerations than the case of the discharged public employee. *Goldberg* involved welfare benefits, the termination of which, pending resolution of the controversy, could "deprive an *eligible* recipient of the very means by which to live while he waits." *Goldberg,* 397 U.S. at 264, 90 S.Ct. at 1018.

ultimate decision rests with the Manager who made the initial personnel decision, renders the hearing procedurally deficient for lack of an impartial decisionmaker. We agree with the court below that these assertions have little merit.

First, the fact that a hearing tribunal renders an advisory opinion to an ultimate decisionmaker has passed without serious comment or procedural challenge in numerous cases. *See, e.g., Nevels v. Hanlon*, 656 F.2d 372 (8th Cir.1981) (state civil service appeals board issued recommendation to Commissioner of Labor); *Frumkin v. Board of Trustees, Kent State University*, 626 F.2d 19 (6th Cir.1980) (University Hearing Committee issued recommendation to University President). At his hearing, Brasslett was afforded a relative panoply of safeguards. The Appeals Board heard evidence from both sides and the parties were represented by counsel. Brasslett cannot seriously contend that the fact that the Appeals Board's decision was not binding, standing alone, rendered this hearing nugatory. The critical question, then, as the plaintiff indeed suggests, is whether Manager Cota, as the ultimate decisionmaker, was sufficiently impartial to satisfy the requirements of due process. An impartial adjudicator is elemental to due process under the Fourteenth Amendment.

We believe, however, that the procedural protections Brasslett received were not constitutionally insufficient solely because Manager Cota issued both the initial discharge decision and the final decision after the Appeals Board hearing. The Supreme Court clearly denounced such a *per se* rule in *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In *Withrow*, the Court held that a decisionmaker who is involved in both investigative and adjudicative functions may not be presumed unconstitutionally biased. *Id.* at 53–54, 95 S.Ct. at 1467–1468. Rather, a plaintiff alleging impartiality must overcome the presumption that administrators are "men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances," and must demonstrate an actual risk of bias or

prejudgment. *Id.* at 56, 95 S.Ct. at 1469, *quoting United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). This court has likewise required a specific demonstration of partiality where a police Commissioner issued an administrative order and subsequently presided over the hearing to suspend officers for disobeying it. *O'Brien v. DiGrazia*, 544 F.2d 543, 546–47 (1st Cir.1976), *cert. denied sub nom., O'Brien v. Jordan*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). We can discern no relevant distinction between that situation and one in which the ultimate decisionmaker on appeal had also made the challenged personnel decision. *See Perkins v. Board of Directors*, 528 F.Supp. 1313 (D.M.1981), *aff'd*, 686 F.2d 49 (1st Cir.1982) (finding no inherent bias where school board made initial nonrenewal decision and also conducted the appeal hearing).

The court below was quite correct in observing that Brasslett failed to demonstrate that Cota harbored actual bias against him. In addition, he made no showing that circumstances existed which might ordinarily give rise to an inordinate risk of bias; Cota had no pecuniary interest in the outcome of the plaintiff's appeal nor did he have any animosity toward Brasslett as a result of personal criticism or attacks. *See Withrow*, 421 U.S. at 54–55, 95 S.Ct. at 1468–1469. To the contrary, even after the interview, Cota described his working relationship with Brasslett as a good one. Cota Deposition, p. 69. Accordingly, any argument that the Town of Orono neglected to provide Brasslett with an impartial decisionmaker must fail.

Finally, the plaintiff argues that the Town personnel regulation under which he was discharged is void for vagueness. In his letter of dismissal, Manager Cota cited the Town Charter, § 1.3.12(C)(11) as authority for the personnel action. That rule is the "catch-all" disciplinary provision, authorizing the Manager to impose sanctions in any situation "of such seriousness that disciplinary action is considered warranted." The plaintiff contends that this regu-

lation was so broad and open-ended that it was impossible for him to discern what conduct it prohibited. More specifically, he claims that he could not reasonably have known he could be dismissed for the remarks he made during the December 4, 1982 interview.

■ The due process clause of the Fourteenth Amendment requires that statutes or regulations be sufficiently specific to provide fair notice of what they proscribe. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential element of due process...", and is therefore void. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). It is quite true that the rule plaintiff attacks is a broad one, vesting wide discretion in the Town Manager. However, strikingly similar regulations and ordinances have withstood constitutional challenge both before this court and the Supreme Court of the United States.

In *Arnett v. Kennedy, supra*, 416 U.S. at 169, 94 S.Ct. at 1652, a majority of the Supreme Court upheld a provision of the Lloyd-La Follette Act, 5 U.S.C. § 7501(a), which authorized removal or suspension without pay of non-probationary federal employees "for such cause as will promote the efficiency of the service." The Court stressed the impracticability of formulating an exhaustive list of actionable conduct, and the correlative need for a general removal provision. *Arnett*, 416 U.S. at 160–162, 94 S.Ct. at 1647–1648. This court itself has upheld a similar "catch-all" clause invoked by a school board to discharge a teacher. *Wishart v. McDonald*, 500 F.2d 1110 (1st Cir.1974). There, the disputed regulation provided for dismissal for "con-

duct unbecoming a teacher." *Id.* at 1116–17.

■ The plaintiff in the instant case argues that our vagueness analysis in *Wishart* should be inapplicable where, as here, the public employee is discharged on account of speech. It is certainly arguable that an employee would be forced to engage in hair-splitting to determine precisely what utterances are and are not prohibited by a general misconduct provision. We find, however, that *Arnett* is dispositive of the plaintiff's contentions, since that case involved a discharge for speech. In *Arnett*, the federal employee was discharged for making false and maligning statements about his supervisor. The Court found that the discharge provision in question did prohibit certain types of employee speech. It held, however, that the provision should be construed as prohibiting only speech which is not protected under the First Amendment. *Arnett*, 416 U.S. at 162, 94 S.Ct. at 1648.

In the case now before us, the pivotal point of contention is whether the plaintiff's speech was in fact constitutionally protected. If it was not, we see no reason why the Supreme Court's disposition of the vagueness claim in *Arnett* is not equally applicable here. On the other hand, if it was protected, we believe that Brasslett has improperly invoked the vagueness doctrine. In such an event, the actionable legal infirmity lies not on the face of the Town ordinance, which, construed as the *Arnett* Court would direct, is valid under the Fourteenth Amendment. Rather, the injustice against the plaintiff arises out of the fact that the defendants have invoked an otherwise valid regulation to justify an independently unlawful termination—one in retaliation for the plaintiff's exercise of his First Amendment rights.[9] Accordingly,

---

**9.** It is true that after rejecting the plaintiff's void for vagueness claim in *Wishart* we noted, "This would be a different case if the cause for dismissal were speech or another constitutionally protected activity, even one considered odd or suggestive by the community." *Wishart*, 500 F.2d at 1116, n. 7, *citing Pickering, supra,* 391 U.S. at

568, 88 S.Ct. at 1734. In saying that the case would be different if the First Amendment were involved, we meant not that we would have reached a different disposition on the vagueness claim, but rather that the validity of the discharge would have to be analyzed in a different light.

it is to the plaintiff's First Amendment argument that we now turn.

## B. First Amendment Claim

### 1. Applicable Legal Standard

■ In order for the plaintiff to prevail on his claim of unconstitutional retaliation, he must, as an initial matter, demonstrate that his speech was protected by the First Amendment under the standards set forth in *Pickering v. Board of Education, supra,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811. Next, he must show that the protected speech was a motivating factor in the defendants' decision to dismiss him. It is then incumbent on the defendants to prove, by a preponderance of the evidence, that they would have taken identical personnel action in the absence of the protected conduct. *Mt. Healthy City School District Board of Education v. Doyle, supra,* 429 U.S. at 287, 97 S.Ct. at 576.

The Supreme Court in *Pickering* set forth the general test for determining whether a public employee's speech on matters of public concern is protected under the First Amendment. Rejecting any argument that an individual, merely by accepting public employment, relinquishes his First Amendment rights, *Pickering,* 391 U.S. at 567–68, 88 S.Ct. at 1734–35, the Court did recognize that the government's interest as an employer in regulating employee speech differs from its interest in regulating the speech of the general citizenry. Accordingly, it formulated a test which balances the pertinent concerns; a court must weigh the interest of the employee, as a citizen, in commenting on matters of public concern against the government's interest, as an employer, in promoting the efficiency of the public services it performs through its employees. *Id.* at 568, 88 S.Ct. at 1734.

■ In undertaking this balancing procedure, both the character and effect of the public employee's speech are relevant considerations. Thus an employer has a greater interest in curtailing erroneous statements than correct ones, and still a greater interest in curtailing deliberate falsehoods.

The government also has a more legitimate concern for speech which actually impairs its functions than for that which does not. Correspondingly, an employee's interest in making public statements is heightened according to their veracity and innocuity. It is with these factors in mind that we must analyze whether the plaintiff's speech is protected under the Constitution.

### 2. Appropriate Standard of Review

■ The United States Supreme Court recently held that an appellate court reviewing First Amendment cases is not bound by the clearly erroneous standard set forth in Fed.R.Civ.P. 52(a). In *Bose Corporation v. Consumers' Union of U.S.,* ⸺ U.S. ⸺, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the Court reaffirmed the rule of independent appellate review historically applied in First Amendment cases, *see e.g., New York Times v. Sullivan,* 376 U.S. 254, 284–85, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964), and held that this Court had properly examined the trial record in a products disparagement case to determine *de novo* whether the plaintiff had proven the defendants' "actual malice" by clear and convincing evidence. *Bose,* 104 S.Ct. at 1958. In cases where the line between unconditionally guaranteed speech and speech which may be legitimately regulated must be drawn, the Court has traditionally stated:

> the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see ... whether they are of the character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. We must make an independent examination of the whole record so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.
>
> *Id.* 376 U.S. at 285, 84 S.Ct. at 729 (citations omitted).

This rule reflects the deeply held conviction that courts must conscienciously exercise their review powers to protect precious

constitutional liberties. *Bose,* 104 S.Ct. at 1965.

The *Bose* opinion sought to reconcile and explain the apparent conflict between the *New York Times* standard of independent review and the clearly erroneous standard imposed by the Federal Rules. While Rule 52(a) applies to findings of fact, including "ultimate facts", it "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact that is predicated on a misunderstanding of the governing rules of law." *Id.* at 1960. The Court concluded that a trial judge's ultimate fact determination of whether false statements were made with actual malice is, because of the unique characteristics of the applicable legal rule, to be treated as a matter of constitutional law. It identified the crucial characteristics as follows:

> First, the common law heritage of the rule itself assigns an especially broad role to the judge in applying it to specific factual situations. Second, the context of the rule is not revealed simply by its literal text, but rather is given meaning through the evolutionary process of common law adjudication; though the source of the rule is found in the Constitution, it is nevertheless largely a judge-made rule of law. Finally, the constitutional values protected by the rule make it imperative that judges—and in some cases judges of this Court—make sure that it is correctly applied.

*Id.* at 1960.

■■■ We believe that *Bose* clearly requires us to undertake an independent review of the district court's ultimate finding that Brasslett's statements to the press were unprotected under the First Amendment. *Cf. Bickel v. Burkhart,* 632 F.2d 1251, 1252, 1256 (5th Cir.1980) (stating that *Pickering* balancing test is a question of

law). Like the determination of actual malice, the balancing test prescribed in *Pickering* exemplifies an inextricable relationship between the evolution of constitutional law and the case-by-case application of specific facts to existing legal rules. We must therefore examine, under the appropriately heightened standard, the correctness of the trial judges' findings of fact regarding the pertinent interests to be weighed—the nature of the plaintiff's speech and the impact of that speech on the defendants' ability to perform their public responsibilities.

### 3. Brasslett's Remarks During the Television Interview of December 4, 1982 Were Not Recklessly False

The district court concluded that some of Chief Brasslett's statements to the media were knowingly or recklessly false, and as such, were excluded from the protection of the First Amendment. Memorandum Opinion, p. 23. Before assessing the court's ultimate conclusion that the remarks were malicious,[10] we must clarify the applicable legal principles. In *Pickering, supra,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, the Supreme Court expressly declined to adopt a rule directing that knowingly or recklessly false statements are *per se* unprotected. It stated that "we do not deem it appropriate or feasible to attempt to lay down a general standard against which all [public employee] statements may be judged." *Id.* at 569, 88 S.Ct. at 1735. Although the fact that a statement is recklessly false may well create a presumption that the employee's interest in uttering it is subordinate to the government's interest in suppressing it, the Court has preserved the possibility that such a statement might be protected if it resulted in no actual harm to the employer. *Id.* at 574 n. 6, 88 S.Ct. at 1738 n. 6; *Cf. Santos v. Miami Region, U.S. Customs Serv.,* 642 F.2d 21, 25 (1st Cir.1981) ("Criti-

---

**10.** The district court apparently analogizes knowingly or recklessly false employee speech to malicious publication regarding public figures which are excluded from constitutional protection in defamation suits. Memorandum Opinion, p. 23, citing *New York Times v. Sullivan,* 376 U.S. at 280, 84 S.Ct. at 726. Because

the court adopted the New York Times definition of malicious statements—those which are knowingly or recklessly false—to characterize Brasslett's speech we shall use the terms "malicious" and "knowingly or recklessly false" interchangeably throughout our own discussion of this case.

cisms made with malice or with knowledge that they contained falsehoods may not be protected."). Thus a finding that Brasslett's statements were malicious is but a factor to be weighed in the balancing of interests.

 After reviewing the entire record, we conclude that the defendants have failed to show that the plaintiff's public statements were knowingly or recklessly false. To find malice, there must be sufficient evidence to conclude that Brasslett made false statements and that he either knew they were false or he "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The question of malice is a subjective inquiry into the speaker's actual state of mind, rather than an objective analysis of what a reasonably prudent person would have said. *Id.* Although the public perception of the meaning of Brasslett's remarks may be relevant to determining whether they were truthful or negligently erroneous, it is the facts as Brasslett actually knew them, and their objective consistency or inconsistency with the statements he made, that is relevant to a determination of malice. We find the record totally devoid of objective facts from which malicious intent could be inferred or of more direct evidence of Brasslett's malignant motives.

First, we are not at all convinced that the district court properly could find that Chief Brasslett's statements were not substantially correct. The truth or falsity of an assertion should be determined by inquiring into the ordinary meaning that a reasonable person would attribute to it. *Bose Corporation v. Consumers' Union of U.S.*, 508 F.Supp. 1249, 1265 (D.Mass.1981);

*see Lyman v. New England Newspaper Publishing Co.*, 286 Mass. 258, 260, 190 N.E. 542 (1934). We think it strains credulity to conclude that the reasonable person would have construed the Fire Chief's statements as the defendants urge they would. We will, however, assume the falsity of the statements for the purposes of this decision, since we believe that the district court committed an even more fundamental error in the application of the facts of this case to the legal principles governing the determination of what employee speech is protected under *Pickering*. Nevertheless, a survey of the record evidence as to the truth or falsity of the plaintiff's remarks is relevant to our conclusion that Brasslett made the remarks without malice. The evidence tending to prove that the statements were erroneous is so scant, and any falsity attributable to those statements is so debatable, that the record creates an inference against malice rather than in favor of it.

The trial judge found that at least three of the plaintiff's statements were recklessly or knowingly false. We shall examine each in turn. The first statement pertained to the Town Council's policies on the purchase of replacement fire equipment, which was apparently relayed to the interviewer by Brasslett. The interviewer's paraphrased version of the statement, which appeared on the telecast news spot, is the publication to which the defendants object.[11] She commented: "Brasslett says a major problem is the Town buys trucks at the lowest cost, and usually not equipped with the specifications Brasslett needs. As a result, the trucks fall apart rapidly." *See* Interview, *supra*. From our reading of the record, the various exhibits and deposition

---

**11.** The record of this case reveals that while Bousquet claims that she accurately recounted the information Brasslett gave her, Brasslett claims that she at times incorrectly repeated his statements. While it is certainly the province of the trial judge to make credibility judgments, we believe that in this case, the trial judge's finding that the interviewer's commentary accurately reflected Brasslett's actual statements does not provide a reliable basis for finding Brasslett's

statements were false. The defendant's allegations of falsity at times rest on the precise wording of the interview statements and the inferences that may be drawn therefrom. Because Bousquet's commentary was admittedly a paraphrase and not a direct quotation, it seems erroneous to judge the truth or falsity of Brasslett's statements according to the precise text of the interview commentary.

testimony indicate that this statement, read literally, is substantially correct. The Town Manager himself acknowledged that during Brasslett's tenure as fire chief, various pieces of the Town's fire equipment were non-operational at one point or another, sometimes for as long as six weeks. Cota Deposition, p. 36. These breakdowns were admittedly attributable to the age of the equipment. Cota also stated that Brasslett had initiated council action to replace at least one of the pumper trucks as early as October 1981, and that although the Council approved specifications for replacement equipment on December 3, 1982, the interim time period was marked by controversy over the revision of the original specifications. *Id.* at 37–40. Juxtaposing these facts with the remarks attributed to Brasslett, we cannot characterize the statements as malicious. They seem at worst to be an expression of Brasslett's opinion, based on his own knowledge, that the Town Council could perhaps do something more or something different to enhance the Town's fire protection capabilities.

The second statement at issue, also relayed to the public solely through the interviewer's commentary, was as follows:

> Last night Brasslett advised City Manager Cota of the latest breakdown. Cota said he would get a mechanic to work on the truck on Monday. Brasslett says repairs are costly and usually take weeks because of a lack of parts for older model trucks. Chief Brasslett hopes a special Council meeting will be called on Monday or Tuesday to vote on emergency funding for a new truck. If that meeting is not held, the next regular Council meeting will be held on December thirteenth.

Interview, *supra.*

The district court found this statement recklessly false because it implies that the Town had taken no action to improve the fire equipment situation, even while Brasslett was well aware that the latest specifications for a fire truck had been approved and bidding would most likely commence soon. We disagree. We do not believe that the statement created a negative inference that the Town Council was ignoring the fire station's equipment problems. What Brasslett said he hoped for was an emergency measure allowing for the immediate purchase of equipment in response to a breakdown of which the Council might not yet have been aware. More significantly, the remark was totally consistent with Brasslett's knowledge that the Council had approved specifications for the purchase of a new truck. The competitive bidding process typically utilized by the Town involved a potentially long time period between approval of "specs" and actual purchase of new equipment. To illustrate, the Council did not actually authorize bidding until December 13, 1982 and a final decision was not made until February of 1983. Deposition of Cota, p. 40.[12]

Finally, the district court found that Brasslett's statement that the Town of Orono had only a 1959 Ford front mount pump for fire protection was maliciously false because Brasslett was aware that the Town also had an aerial ladder truck, a tanker truck, and a Dodge pumper, and that Orono had mutual aid pacts with surrounding communities to supplement its own fire fighting capabilities. The record reveals that at the time of the interview, the Town owned a 1970 Ward LaFrance pumper, a 1959 Ford pumper, a 1965 Dodge pumper, a tanker, and an aerial ladder truck. Cota Deposition, p. 44. The Ward LaFrance was out of service for myriad

**12.** It is revealing that the second television interview, aired on December 8, 1982, reiterates the information relayed in the December 4 interview regarding the status of the Town Council's plans to purchase a new truck. Manager Cota, who was present at the second interview, has characterized it as an accurate depiction of Orono's firefighting situation. During that interview, the Channel 2 commentator stated: "Oro-

no still needs another fire truck. The Council is now looking over specifications. Cota and Brasslett hope a decision on purchase of a new truck is made fairly soon." Interview, *supra* note 2. We believe this statement confirms rather than contradicts the veracity of the implications of Chief Brasslett's statement during the December 4 interview.

problems and had been for the past four weeks; the Dodge pumper had, the previous evening, developed a rear end noise en route to a fire call, *id.* at 43; and the tanker and aerial ladder trucks, while operational, were merely support vehicles with no fire extinguishing capabilities independent of a pumper. Brasslett Deposition, p. 31.

We believe that the interview, read in its entirety, negates any inference that Brasslett was attempting to misrepresent the extent of Orono's fire equipment. Brasslett must have mentioned each and every piece of equipment to the interviewer, since she listed all of the trucks during the actual televised segment. In addition, earlier in the interview, referring to the pumpers, Brasslett had commented at the time that two of them were out of service. *See* Interview, *supra.* The record reveals additional evidence compelling the conclusion that Brasslett's response was in complete harmony with the facts as he knew them to be. First, Brasslett knew that the aerial and tanker trucks were merely support equipment and it is quite reasonable for him to omit them from a list of fire fighting vehicles. Brasslett Deposition, p. 31. Second, Brasslett's omission of the Dodge pumper from a discussion of available equipment was entirely consistent with the facts as he believed them to be. The night before the interview, the Dodge had developed a rear end problem which Brasslett believed would warrant "down time". Cota Deposition p. 43. After Brasslett alerted Cota to the situation, the two men "talked about the fact that the 1968 Dodge pumper could be taken to a fire—driven to a fire in a safe and prudent manner if the need occurred." *Id.* Brasslett, however, believed the safety and operability of the truck was questionable. Brasslett Deposition, p. 35. Finally, and most significantly, during the second television interview on December 8, which, according to Manager Cota, accurately depicted Orono's firefight-

ing situation, the commentator stated in Cota's presence that the Dodge pumper had been out of service during the December 4 interview. *See* Interview, *supra,* note 2.

We come at last to the district court's finding that Brasslett's statement was recklessly false because he failed to mention Orono's mutual aid pacts with neighboring communities. In his defense, the plaintiff claims that he did in fact mention the pacts during the interview. Brasslett Deposition, p. 31. While Bousquet denies this, it is undisputed that the telecast news spot was the product of extensive editing, and, unfortunately, the original tape is unavailable.[13] In addition, the cameraman explicitly recalled Brasslett discussing the mutual aid arrangements prior to the interview. McLeod Deposition, p. 12. We believe that regardless of whether or not Chief Brasslett mentioned the mutual aid pacts during the actual interview, the record does not support a conclusion that he omitted them maliciously. The fact that he indeed discussed them at some point with Channel 2 personnel negates an inference that he had any intent to conceal their existence in order to depict a crisis. Furthermore, considering the context of Bousquet's question, Brasslett's failure to allude to the mutual aid pacts does not seem unreasonable, let alone reckless. The entire interview, both prior to and following the question, had focused entirely on Orono's fire fighting *equipment.* Brasslett's omission of the agreements from his answer, while it might arguably have rendered the statements erroneous, could hardly be deemed malicious. *Cf. Pierce v. Capital Cities Communications, Inc.,* 427 F.Supp. 180, 185–86 (E.D.Pa.1977) (disparity by omission between what party knew and what he said does not constitute actual malice).

In conclusion, having independently reviewed the record, we believe that the trial

---

**13.** The original interview was about 5 minutes long, and the accompanying video footage was approximately 20 minutes long. Bousquet Deposition, p. 24; McLeod Deposition, p. 15. Bousquet's notes of the interview were destroyed and she cannot recall what information was edited from the tape before broadcast. Bousquet Deposition, p. 29–32.

judge, in finding that the plaintiff knowingly or recklessly made false statements to the press, impermissibly ·indulged every conceivable inference against the plaintiff. Because this is inconsistent with a judge's obligation to vigorously guard and preserve an individual's First Amendment rights, this finding must be overturned.

### 4. Brasslett's Remarks, Even If Erroneous, Were Protected Speech Under the Pickering Balancing Test

Assuming *arguendo* that at least one of the statements Brasslett made during the December 4 interview was negligently false, we proceed to the *Pickering* balancing test to determine whether those statements were nonetheless protected under the First Amendment. We believe that the remarks were clearly protected speech. The district court, in holding otherwise, has obscured the values underlying the First Amendment and condemned the very type of public discourse that our Constitution actively seeks to preserve, even at substantial cost to the government. That Brasslett's interview may have been somewhat critical of the Town or the Council hardly strips it of First Amendment sanction. The Amendment was calculated to protect precisely this type of speech, since it is likely that the government would be motivated to stifle only critical, revealing, or embarrassing remarks. Likewise, the mere fact that the statements were erroneous does not remove them from the Constitution's protection; erroneous remarks are an inevitable by-product of unrestrained public debate. To deny protection to false statements negligently made would chill discourse altogether. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340–41, 94 S.Ct. 2997, 3007–08, 41 L.Ed.2d 789 (1974). Under *Pickering*, therefore, erroneous statements of public concern will be protected unless they are shown to have interfered with the

employee's performance or the regular operation of his governmental agency. *Pickering*, 391 U.S. at 572–73, 88 S.Ct. at 1736–37; *Santos v. Miami Region, U.S. Customs Serv.*, 642 F.2d 21, 25 (1st Cir.1981).[14]

Although the Supreme Court has deemed it unfeasible and inappropriate to set forth a uniform standard for determining at what point harmful impact on the government reaches the magnitude that it overshadows the revered right of an individual to engage in free speech, it has offered some general guideposts. *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735. As we stated in *McDonough v. Trustees of the University of New Hampshire*, 704 F.2d 780 (1st Cir.1983), we should inquire:

(1) whether [the allegedly protected activity] was directed against those with whom the plaintiff is in regular contact such that it might impede harmony among co-workers or the ability of supervisors to maintain discipline; (2) whether plaintiff's activity has a detrimental impact on those with whom he must maintain personal loyalty and confidence for the fulfillment of his job responsibilities; and (3) with regard to erroneous statements concerning matters of public concern, whether such statement impedes plaintiff's performance of his daily duties or the regular operation of the [governmental unit] generally.

*Id.* at 784, citing *Pickering*, 391 U.S. at 569–73, 88 S.Ct. at 1735–37.

We shall examine the record in the case before us to determine whether any of the above mentioned situations were generated by Chief Brasslett's remarks to the press. That the first condition is wholly absent here is so obvious that it warrants minimal discussion. Brasslett's remarks were, neither in content nor tone, a personal attack upon anyone with whom he was required to

---

**14.** Although employee statements which are of private rather than public concern are entitled to diminished First Amendment protection, *see generally Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the defendants here have made no attempt to deny that

Brasslett's statements were of public concern. Nonetheless, it is obvious that commentary on the available fire protection within the Town and the Town Council's actions in dealing with related problems is a prototypical matter of public interest.

work on a daily basis. Likewise, the defendants have made no assertions that the interview resulted in a disruption of harmony or discipline.

The district court primarily relied on the second situation described above to justify Brasslett's discharge. It accepted the defendants' argument that the plaintiff, in making reckless false and misleading statements to the press, demonstrated a severe lack of judgment that eroded the crucial confidence that the Town Manager must have in his department heads. We will first attempt to clarify a proper framework for analyzing the validity of this conclusion. We believe the defendants must show that: 1) to properly fulfill his job responsibilities, it was necessary that the plaintiff maintain a relationship of personal trust and loyalty with his employer or supervisor; 2) that the plaintiff's allegedly protected activity had a detrimental impact on that same employer or supervisor; and 3) that the detrimental impact was objectively sufficient to have eroded the trust relationship.

We stress this third factor because, where First Amendment rights are concerned, "operational efficiency objections must be real and important before they can serve as a basis for discipline or discharge of a public employee." *Key v. Rutherford,* 645 F.2d 880, 885 (10th Cir.1981). Unless we require that the employer's alleged loss of confidence and trust in his employee be objectively reasonable, public employers could promiscuously offer a subjective justification that could almost never effectively be rebutted.

Applying this framework to the case at hand, we concur in the district court's initial finding that trust and confidence were essential to an effective working relationship between the Fire Chief and the Town Manager. However, we find the argument

that Brasslett's interview had a detrimental effect on Cota to be contrived. The defendants made no contentions that Brasslett's remarks impeached Cota's reputation, performance, or qualifications in any way with either the public generally or the Town Council. Rather, the district court found that Brasslett's statements created an artificial crisis, thereby requiring Cota to address a memorandum to the Town Council explaining the Town's fire protection situation, and to arrange a second television interview to correct any public misapprehensions. We believe it obvious that these measures were part and parcel to Cota's every day duties as Town Manager and simply cannot be characterized as a detriment to him personally.

As to the defendants' argument that the fact that Brasslett made recklessly false statements to the media could reasonably and did actually undermine Cota's confidence in Brasslett, we point out that we have already found that Brasslett's statements were not reckless, but were, at their most onerous, merely negligently false.[15] The pertinent question then is whether the fact that Brasslett made negligently false statements, standing alone, could reasonably give Cota cause to lose all confidence in the Fire Chief. *Pickering* requires us to answer that inquiry in the negative. It explicitly recognizes that some public employees will inevitably make erroneous statements while engaging in public comment, and that those statements may embarrass or even harass their government employers. *Pickering,* 391 U.S. at 568–70, 88 S.Ct. at 1734–36; *see also Peacock v. Duval,* 694 F.2d 644, 647 (9th Cir.1982). It is axiomatic, therefore, that an employer may not be allowed to claim that his essential trust relationship with an employee was eroded solely by virtue of the employee's statements. There must be an addi-

---

**15.** The argument is even further undermined by the fact that Manager Cota was apparently only mildly upset by Brasslett's statements upon his initial viewing of the interview. He said, "I guess I was a bit shocked by some of the things

that were said. I was a bit upset by the signs that were on the vehicle...." Cota had acknowledged that Brasslett was not responsible for the signs. *See* Letter of Dismissal, *supra* note 3.

tional and independent showing of actual and significant harm.

It is with that observation that we turn to the final circumstance which could properly justify the dismissal of a public employee. Brasslett could be discharged if his erroneous statements either interfered with the performance of his daily duties or impeded the functioning of the Town or the Fire Department. The district court accepted defendants' argument below that Brasslett's remarks had a disruptive effect on the Town by creating an artificial crisis over Orono's fire fighting capabilities. The record facts simply do not support this finding.

The evidence in this case indicates that the December 4 interview itself generated very little public response, and such public concern that did exist over the fire protection situation either predated the interview or continued after the second television interview, which supposedly corrected Brasslett's misrepresentations.

The Town Manager himself received only a handful of calls regarding the interview, and some of those calls, rather than expressing concern over the firefighting situation, indicated a concern that the interview did not reflect very well on the Town. Cota Deposition at 46–48. One call Cota received was from the Town Council Chairman who was concerned about the fire protection situation, not because of the interview which he had not seen, but because of a phone call he had received from a Mr. Pixley complaining about the inadequacies of Orono's fire equipment. Cota Deposition at 46. While we think it probable that some public concern was indeed generated by the interview, it certainly did not rise to the level of a crisis or panic. In addition, the minutes of the Town Council Meeting for December 13 show that what public concern did exist persisted after the supposed corrective action of the second interview given by Cota to clarify Orono's firefighting capabilities. *See* Minutes of Town Council Meeting, December 13. We believe this indicates that any "crisis" conceivably created by Brasslett's remarks was far from artificial. Orono's firefighting capacity, even as described in the second interview, was truly less than ideal.

In sum, we think it clear that the defendants' proffered justifications for Chief Brasslett's dismissal are merely artful attempts to conceal the fact that Brasslett was fired because he raised questions as to the adequacy of Orono's fire protection to the public, thereby embarrassing the Manager and the Council. But under *Pickering*, an employee's First Amendment rights to comment on and criticize his employer's actions shall not yield to an employer's interests in averting embarrassment. Were it otherwise, of course, an employee would have no right at all to engage in public criticism. That is a notion that the Supreme Court long ago flatly rejected. Accordingly, we find that Brasslett's speech was constitutionally protected.

### 5. Brasslett Would Not Have Been Discharged But For The Protected Speech

Since we have determined that Brasslett's speech was protected, the defendants must have shown by a preponderance of the evidence that they would have discharged Brasslett in the absence of the protected conduct. *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576. The record in this case is replete with clear and convincing evidence that had he not given the December 4 interview, Brasslett would not have been fired. Most strikingly, the letter of dismissal written by Cota on December 14, states unequivocally that Brasslett's comments to the press were the primary reason for his discharge.

The defendants argue that Brasslett was fired not for the interview statements themselves, but for his lack of good judgment as department head, as had been cumulatively demonstrated by past incidents including, but not exclusively limited to his remarks to the media. We note our complete agreement with the district court that the "jeep incident" is not a proper justifica-

tion for dismissal. We vigorously disagree, however, with its finding that the circumstances surrounding Brasslett's prior suspension, his failure to discipline the fireman responsible for the "Sunkist" signs, and his "knowing and reckless false interview statements" were adequate independent justification for his dismissal. First, we do not believe that Brasslett's failure to discipline the fireman who posted the "Sunkist" signs was an independent ground for his discharge. The defendants in this case have not made such an argument, nor have they adduced any evidence that Brasslett in fact failed to take appropriate disciplinary action.[16] Nor may Brasslett's prior suspension be invoked as an independent justification for his dismissal. Although the Manager indeed may have imposed a lesser sanction than dismissal were it not for the prior suspension, he *obviously would have imposed no sanction whatsoever absent the interview remarks.* Since we have already determined that Brasslett's speech was not in fact malicious, this discharge decision was made entirely on account of his constitutionally protected remarks.

For the foregoing reasons, we find that in discharging the plaintiff, the defendants unconstitutionally retaliated against him in violation of his First Amendment rights. The judgment of the lower court is therefore REVERSED.

16. Although Cota mentioned in his dismissal letter that Brasslett had failed to inform him of *what* disciplinary action was taken against the firemen, this hardly satisfies the defendants' burden under *Mount Healthy* to show that Brasslett was fired because he failed to take any action.