Bruce E. KENNA, Plaintiff,

v.

The UNITED STATES DEPARTMENT OF JUSTICE; Edwin Meese, III, as Attorney General; D. Lowell Jensen, as Deputy Attorney General; William P. Tyson, as Director, Executive Office for United States Attorneys; Lawrence S. McWhorter, as Deputy Director, Executive Office for United States Attorneys; Susan A. Nellor, as Director, Office of Legal Services, Executive Office for United States Attorneys; and Richard V. Wiebusch, both personally and as United States Attorney for the District of New Hampshire, Defendants.

Civ. A. Nos. R.I.—86–0202T, N.H.—C86–125D.

United States District Court, D. New Hampshire.

Nov. 9, 1989.

Carroll F. Jones, Robert J. Lynn, Ronald L. Snow, Concord, N.H., Raymond J. Kelly, Manchester, N.H., for plaintiff.

Sharon L. Reich, Patrick Sorek, J. Ledbetter, Civil Div., Dept. of Justice, Washington, D.C., for defendants.

## DECISION AND ORDER

TORRES, District Judge.*

This is an action by a former Assistant United States Attorney (AUSA) who seeks reinstatement and damages for what he alleges were violations of his constitutional and civil rights when he was dismissed from his position. It is presently before the Court for decision on the defendants' renewed motion for summary judgment.

* Of the District of Rhode Island.

## FACTS

In 1981, Bruce Kenna began his tenure as an AUSA in the office of the United States Attorney for the District of New Hampshire. At that time, the United States Attorney in charge of that office was Stephen Thayer. In 1984, as part of an investigation of a drug organization allegedly headed by one Stephen Young, Thayer caused grand jury subpoenas to be issued to a number of attorneys representing suspected members of the organization. That action sparked an intense debate within the New Hampshire legal community. It was also the subject of a First Circuit opinion which, essentially, upheld a district court order quashing the subpoenas but left open the possibility that such subpoenas could be reissued at a later date or issued under other circumstances. *See In re Grand Jury Matters*, 751 F.2d 13 (1st Cir.1984).

Shortly thereafter, Thayer resigned and, in June of 1985, was replaced by Richard Wiebusch who appointed Kenna as his First Assistant.[1] One of Wiebusch's first acts was to circulate a memorandum among the four AUSAs in the office soliciting their views with respect to subpoenaing attorneys. That was followed by a series of meetings during which the subject was discussed. At those meetings, Kenna advocated continuing the previous policy and reissuing the Young subpoenas. Wiebusch, however, disagreed. On July 22, 1985, he distributed policy guidelines discouraging attorney subpoenas "except in cases where the attorney consents; where it is apparent that necessary proof exists in the attorney's hands and cannot be obtained by any other means; or where the attorney himself is a target." That same day Wiebusch also informed Kenna of his intention not to reissue the Young subpoenas. Kenna conceded Wiebusch's right to adopt the new policy but reiterated his disagreement. He also argued that, even under that policy, the Young subpoenas should be reissued. Furthermore, he expressed his intention to go through Depart-

ment of Justice (DOJ) channels to obtain such subpoenas when he felt it necessary.

Matters remained relatively tranquil until August 24, 1985. At that time, the text of an interview with Wiebusch was published in the *Foster's Daily Democrat*. In that article, Wiebusch expressed a "personal philosophy" that was "very much against issuing a subpoena for lawyers' files" and said that his approach would be one of more restraint in this area. In reference to the First Circuit's decision, he was quoted as saying, "[t]here is no doubt but that the general impression among lawyers was that this office had not gone about obtaining those subpoenas in the right way." The reporter concluded the article by saying, "the issue is not likely to come up in New Hampshire while he heads the office."

The AUSAs in the office, all of whom were holdovers from the Thayer administration, perceived those statements as criticism of them and their past practices. Consequently, when Wiebusch returned to the office on August 30, Kenna informed him that the article had created a "morale problem" and suggested a meeting to discuss the situation. The meeting was held that day and was attended by all four AUSAs: Bruce Kenna, Kevin Sharkey, Richard Johnston, and Douglas Miller. It was at that meeting that Kenna alleges he made the comments regarding matters of "public concern" for which he was later dismissed. He describes those remarks as dealing with "the propriety of and circumstances under which criminal defense attorneys should be required to appear before grand juries to divulge fee information and other non-privileged material." Conformed complaint ¶ 88. The details of what transpired will be discussed *infra*. For present purposes, it is sufficient to note that the meeting became quite confrontational.

One week later, Wiebusch requested Kenna's resignation. When Kenna refused, Wiebusch wrote to then Deputy At-

---

1. Kenna had previously served as interim United States Attorney until Wiebusch was nominated and sworn.

torney General D. Lowell Jensen, seeking Kenna's dismissal.[2] The letter made it clear that the reasons for Wiebusch's request were *not* that Kenna was incompetent or unethical; but, rather, that "he stands in the way of my running this office in the manner I think best." Wiebusch alluded to several events, that he recognized, "standing alone," were "all relatively minor," but, together, required "that Mr. Kenna must go." The most significant of those events was the August 30 meeting. A summary of Wiebusch's allegations was provided to Kenna by the Executive Office for the United States Attorney (EOUSA).[3]

Shortly thereafter, EOUSA informed Wiebusch that he had authority to demote Kenna from his position as First Assistant without departmental approval. Wiebusch did so, immediately. On October 15 Kenna was told by EOUSA officials that his removal was being recommended to the Deputy Attorney General. However, he was offered an opportunity to transfer to any other United States Attorney's office he might choose. Kenna rejected that offer and on December 18 was terminated "for the good of the service." This action followed.

### PROCEDURAL HISTORY

The original seven count complaint was filed in the District of New Hampshire. Because of the identity of the parties, the district judges there recused themselves. The case was then transferred to the District of Rhode Island where it was assigned to Judge Selya and, later, to this Court.

While the case was under Judge Selya's stewardship, he granted motions to dismiss four of the seven counts and the claims asserted against four of the five defendants in their individual capacities. Those

individuals remain in the case in their official capacities. Wiebusch remains as a defendant in both his individual and official capacities. Three of the counts, alleging due process violations, were dismissed on the ground that the plaintiff lacked a constitutionally protected property or liberty interest. *See Doe v. United States Department of Justice*, 753 F.2d 1092, 1097 n. 4 (D.C.Cir.1985); *See also Windsor v. The Tennessean*, 719 F.2d 155, 159 (6th Cir. 1983) (Assistant United States Attorney as an excepted civil servant has no entitlement to his job). A fourth count, asserting substantive due process violations, was dismissed on the ground that the discharge of an Assistant United States Attorney by his superiors did not constitute a "gross abuse of power." *See Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 832 n. 9 (1st Cir.1982). At the same time, Judge Selya denied motions for summary judgment with respect to the remaining three counts indicating that the record was not then sufficiently developed to warrant summary judgment. Accordingly, he directed the plaintiff to file a conformed complaint.

Count I of the conformed complaint alleges that Kenna's First Amendment rights were violated because he was dismissed for speaking out on a matter of public concern. It seeks injunctive relief reinstating Kenna to his former position. Count II is a so-called *"Bivens"* claim. It, also, charges a First Amendment violation but seeks monetary damages on the theory that the violation was committed by federal officials acting under color of their governmental authority. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Count III asserts that Kenna's dismissal was the product of a

---

2. Under DOJ regulations applicable at the time, only the Attorney General or his Deputy was authorized to dismiss Assistant U.S. Attorneys. *See* 28 U.S.C. § 542; 28 C.F.R. § 0.15(a); 28 C.F.R. § 0.19(a); United States Attorney's Manual, 10–2.621.

3. Kenna also received a copy of the removal letter itself from two secretaries who surreptitiously removed it from Wiebusch's confidential files. He could not, however, respond to the

specific allegations contained therein because it had not been officially presented to him. His attorney remedied this by leaking the letter to the press and persuading the DOJ to furnish him with a copy on the ground that portions of it had been published. Kenna denies any complicity in either purloining the letter or causing its publication. That incident is the subject of a separate memorandum and order regarding the government's application for Rule 11 sanctions.

conspiracy to violate his First Amendment rights and to "injure him on account of and while engaged in the lawful discharge of his duties as a federal officer" in violation of 42 U.S.C. § 1985(1).[4] Conformed complaint ¶ 94. It is these counts that are the subject of the defendants' renewed motion for summary judgment presently before the Court.

## I. *The First Amendment and Bivens Claims*

■ Neither the Supreme Court nor the First Circuit has, yet, determined whether a private cause of action for damages may be brought against a federal official for an alleged violation of First Amendment rights. However, the Supreme Court has recognized that such an action may be brought for violation of other constitutional rights. *See Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (Eighth Amendment); *David v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (due process clause of Fifth Amendment); *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Fourth Amendment). Furthermore, other circuits have given their imprimatur to such actions when First Amendment rights are involved. *See Gibson v. United States,* 781 F.2d 1334, 1342 (9th Cir.1986); *Dellums v. Powell,* 566 F.2d 167, 194–95 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Paton v. La Prade,* 524 F.2d 862, 869–71 (2d Cir.1975). Those decisions and the fact that freedom of speech is one of the most fundamental of constitutional rights leads this Court to conclude that *Bivens* extends to First Amendment violations. Therefore, the Court will proceed to consider the issue underlying the claims asserted in Counts I and II, namely, whether Kenna's First Amendment rights were violated in this case.

■ It is well settled that, in accepting public employment, one does not relinquish one's First Amendment right to comment, as a citizen, on matters of public interest. It is equally well settled that government, in its capacity as an employer concerned with the effective fulfillment of its responsibilities to the public, has a different interest in regulating the speech of its employees than it does in regulating the speech of the citizenry in general. Accordingly, determining the extent to which the First Amendment prevents a public employee from being disciplined for making a particular statement requires striking a balance between these interests. *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

■ In striking that balance, a distinction must be drawn between comments made upon matters of public importance or concern and those that relate only to internal administrative affairs or purely personal matters. Statements falling into the former category are characterized as protected speech. Accordingly, dismissal of an employee who has made such statements warrants close scrutiny to determine whether First Amendment rights have been violated. On the other hand, statements falling into the latter category do not enjoy such a favored status. Consequently, when an employee's comments are solely of that type, such scrutiny is unnecessary. This distinction is based on the recognition that government, in its capacity as an employer, must have some latitude in managing its offices and on "the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick,* 461 U.S. at 143, 146, 103 S.Ct. at 1688, 1689–90.

■ Of course, that does not mean that speech dealing with matters other than those of public concern is totally beyond the protection of the First Amendment. Labelling such speech as not protected is something of a misnomer. Public employees are entitled to the same First Amend-

---

**4.** Counts II and III also assert Fifth Amendment violations. However, Judge Selya's prior ruling that Kenna lacked a constitutionally protected interest in retaining his position is dispositive of those claims.

ment protection from prior restraint, criminal prosecution, liability for defamation and the like as they would have if they were not government employees. The label unprotected simply reflects the fact that the Constitution does not totally immunize government employees from disciplinary action for everything they say and that government employees, like private employees, may be discharged for statements regarding personal or internal matters if they interfere with the proper conduct of the employer's business.

█ In short, the First Amendment prevents a public employee from being disciplined by his or her employer for making statements about matters of public concern. Moreover, it affords the employee the same degree of protection enjoyed by a private citizen for any statement the employee makes whether it relates to matters of public concern or not. However, it does not insulate the employee from disciplinary action by the employer for statements unrelated to matters of public concern that affect the conduct of the employer's business. In such circumstances, the employee may certainly challenge whether the statements had sufficient bearing on his or her job performance to warrant the action taken. However, that challenge must be made in whatever arena is available for contesting personnel decisions rather than as a constitutional attack. As the Supreme Court has said:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Cf. *Bishop v. Wood, supra,* 426 U.S. [341], at 349–350, 96 S.Ct. [2074], at 2079–2080 [48 L.Ed.2d 684 (1976)]. Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amend-

ment to those who do not work for the State.

*Connick,* 461 U.S. at 147, 103 S.Ct. at 1690.

█ In order to successfully contest a discharge as violative of First Amendment rights, a government employee must prove two things. First, the employee must demonstrate that the statements in question are constitutionally protected, or, more precisely, that the First Amendment insulates him or her from disciplinary action for making them. Second, the employee must show that such speech was a substantial or motivating factor in the discharge. If both elements are established, the burden shifts to the governmental employer to prove that the decision would have been made even in the absence of the protected speech. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Brasslett v. Cota,* 761 F.2d 827, 839 (1st Cir. 1985).

In order to be deemed protected, the speech in question must pass a two-part test. First, it must address a "matter of public concern." *Connick,* 461 U.S. at 143, 146, 103 S.Ct. at 1688, 1689; *Alinovi v. Worcester School Committee,* 777 F.2d 776, 786 (1st Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 72, 93 L.Ed.2d 29 (1986); *Brasslett,* 761 F.2d at 844. If it does not, the speech is not protected, and the inquiry is at an end. If it does, the employee's interest "as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

█ Determining whether an employee's remarks address a matter of public concern depends upon "the content, form and context of a given statement, as revealed by the whole record." That is an inquiry which the Supreme Court has said "is one of law, not fact." *Connick,* 461 U.S. at 147–148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1692 n. 10. In making that determina-

tion, it should not be presumed that all matters that transpire within a government office are of public concern. Otherwise "virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691.

■ If a matter of public concern is implicated, a number of factors must be considered in applying the *Pickering* balancing test. One is how important harmonious working relationships among and between employees and their supervisors are to the effective operation of the office. Another is the need to maintain discipline. A third is the degree to which the statements, at issue, prevent achievement of those relationships or that discipline. A fourth factor is the extent to which matters of public concern are involved. Also relevant are the manner, time, place and context in or at which the statements were made. *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692–93; *McDonough v. Trustees of the University System of New Hampshire*, 704 F.2d 780, 784 (1st Cir.1983); *See also Brasslett*, 761 F.2d at 844–846. When close working relationships are important, "a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–152, 103 S.Ct. at 1692–93.

The *Pickering* test and its nuances are often easier to recite than to apply. Situations of this type rarely involve a single statement. More commonly, they involve multiple utterances made over a period of time and on a variety of subjects. Furthermore, they are frequently difficult to characterize as relating exclusively to matters of public concern or private interest. Finally, the legal determination as to whether the statements are protected may turn on a factual determination as to what was said and the circumstances under which it was said. Because of the number of variables involved, the Supreme Court has not "deem[ed] it either appropriate or feasible to attempt to lay down a general standard against which all ... statements may be judged." *Connick*, 461 U.S. at 154, 103 S.Ct. at 1694 (quoting *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735). In essence, what is required is a case-by-case approach in which close calls must sometimes be made.

Since, in this case, the Court is called upon to make its determination in the context of a motion for summary judgment, it must " 'look at the record ... in the light most favorable to ... the party opposing the motion' " and "indulge all inferences favorable to [that] party." *See Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) (quoting *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)). After having done so, it should grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material facts and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In this case, the Court's focus must be on whether the speech in question is constitutionally protected because that is the only element identified in *Mt. Healthy* that is susceptible to disposition via summary judgment. *See, e.g., Ferrara v. Mills*, 781 F.2d 1508, 1515 (11th Cir.1986). The remaining elements (i.e. whether the protected speech was a substantial or motivating factor in the adverse employment decision and whether the employment action would have been taken anyway) are quintessential questions of fact. *See, e.g., Brasslett*, 761 F.2d at 846; *Roberts v. Van Buren Public Schools*, 773 F.2d 949, 954 (8th Cir.1985); *Holley v. Seminole County School District*, 755 F.2d 1492, 1501 (11th Cir.1985); *Wheeler v. Mental Health & Mental Retardation Authority*, 752 F.2d 1063, 1069 (5th Cir.), *cert. denied*, 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985); *Peacock v. Duval*, 694 F.2d 644, 646–48 (9th Cir.1982).

■ Fortunately, it is clear from the complaint that the statements at issue are only those made at the August 30, 1985 meeting between Wiebusch and the four AUSAs. Paragraph 88 of the conformed complaint attributes the plaintiff's dismis-

sal to views he expressed "during the meeting of August 30, 1985." During oral argument, plaintiff's counsel contended that the speech in question included statements made on other occasions as well. However, it is too late in the day to make such an argument. This suit was filed over two years ago. The plaintiff has had ample opportunity to amend the complaint if he wished to broaden its allegations. In the meantime, all of the defendants' discovery with respect to the First Amendment claim has been predicated upon the allegation that the statements in question were made at that meeting. Allowing the plaintiff to, now, substantially alter his position on such a fundamental point would unfairly prejudice the defendants. *See Vargas v. McNamara*, 608 F.2d 15, 18 (1st Cir.1979); *Jaworski v. Rhode Island Board of Regents*, 530 F.Supp. 60, 65 (D.R.I.1981). Accordingly, the Court will confine itself to considering what was said at the August 30 meeting.

### A. *The August 30 Meeting and Its Aftermath*

The extensive discovery conducted in this case reveals that it was Kenna who requested the August 30 meeting and that he did so because he believed that statements attributed to Wiebusch in the newspaper article had created "some pretty bad morale problems" among the assistants in the office. Kenna deposition at 66. He attributed those "morale problems" to what he perceived to be "criticisms ... of the office." *Id.* at 59. Kenna admits that Wiebusch's statements embarrassed him and made him angry because he viewed them as "a public apology for the actions of the U.S. Attorney's office." *Id.* at 59, 73; Kenna answer to interrogatory #8. In light of that anger, he felt that "we should get together and talk about it." Kenna deposition at 66.

At the meeting, Wiebusch apologized for any unpleasantness the article might have caused, but made it clear that the attorney subpoena issue was no longer open to debate, and he would not "rehash" it. *Id.* at 67–69, 71. He then invited each assistant to express his feelings with respect to the article. Kenna described their responses as follows:

Assistant U.S. Attorney Kevin Sharkey was outraged and insulted. At defendant Wiebusch's insistence, Kevin openly questioned Mr. Wiebusch's statement that he had best intentions and did not mean to criticize the office. Kevin reviewed the article line by line and asked Mr. Wiebusch to explain how else he thought the public and the Bar Association would understand the interview.

Assistant U.S. Attorney Doug Miller was outraged and insulted. He told defendant Wiebusch that the decision not to issue the subpoenas and the criticism in the article raised serious doubts in Miller's mind that Wiebusch would support us as prosecutors when pressure from his friends and the Bar Association arose.

Assistant U.S. Attorney Rich Johnston told defendant Wiebusch that public comment was inappropriate and embarrassing. Rick expressed his feeling that the article was critical and that public criticism of the office's past position could hinder prosecutorial efforts and should have stayed internal.

Kenna answer to interrogatory #10.

The tones of voice used by the assistants were characterized as "angry." Kenna deposition at 74. At one point, Wiebusch was asked, "How can you sit there and look us in the face and tell us that you didn't intend that to be a public criticism of every single one of us?" *Id.* at 74. At another point, his willingness to "back up" the assistants was questioned. *Id.* at 76. Things became so intense that AUSA Johnston felt compelled to observe that the tone of the meeting was becoming "very personal" and should be taken in the "right light." *Id.* at 77.

Kenna spoke last. He stated that, like Wiebusch, he was not going to "rehash" the subpoena policy because Wiebusch already knew his views. *Id.* at 78–79. He voiced agreement with the comments of the other assistants and told Wiebusch that he "was insulted and felt his comments during

the interview insinuated that we had been shown the 'distinctions.' " *Id.* at 78. When specifically asked whether he expressed any opinions on the "propriety and circumstances under which criminal defense attorneys should be required to divulge fee information and other nonprivileged material," as alleged in paragraph 88 of the conformed complaint, he responded that he said nothing "other than to tell him that I wasn't going to rehash that thing over, that he knew my position." Kenna deposition at 79. This coincides with the statements of the other AUSAs, none of whom recall any comments made by Kenna regarding the attorney subpoena policy.

In the aftermath of the meeting, the atmosphere at the office was described as "very gloomy," "uncomfortable," and not "healthy." *Id.* at 86, 92. Kenna acknowledges that the "strained relationships" between Wiebusch and the four assistants was having an adverse effect on the efficient operation of the office. *Id.* at 90, 99–100. During the following week the other three assistants apologized to Wiebusch, not for the substance of their comments at the meeting, but for the manner in which they were made. Sharkey deposition at 19, 49–50; Miller deposition at 50; Johnston deposition at 110. Two of them quote Wiebusch as saying that his concern was with the tenor of the meeting and the impression that it had evolved into a personal attack on him. Miller deposition at 51; Johnston deposition at 110.

Unlike the other AUSAs, Kenna tendered no apology to Wiebusch. Nor did he make any other overture to dissipate the tension that he recognized was pervading the office. Kenna deposition at 93–94. A week later Kenna was summoned to Wiebusch's office. Wiebusch expressed the opinion that the August 30 meeting had "gone too far" and "was a personal attack on him." Kenna agreed that the atmosphere in the office had become "intolerable," but urged that they put the meeting behind them and work together. However, Wiebusch, stating that the "personality differences" between the two of them were too serious to allow them to work together productively, suggested that Kenna seek other employ-

ment and offered to provide him with favorable recommendations. When Kenna declined, Wiebusch made it clear he would seek Kenna's involuntary removal. *Id.* at 98–103.

### B. *Application of the Connick Principles*

It is clear from the undisputed facts that the comments made by Kenna and the three other AUSAs during the August 30 meeting did not deal in any meaningful way with the wisdom of Wiebusch's policy regarding attorney subpoenas. Kenna acknowledges that he had previously made his position on this subject clear and did not attempt to rehash it. Rather, the remarks made at that meeting focused on the AUSAs' concern that the article in the *Foster's Daily Democrat* was critical of them, portrayed them in an unflattering manner and raised questions about their relationship with Wiebusch. These are not matters of public importance or concern. They relate to nothing more than internal personnel matters and topics of personal interest to the AUSAs involved. They are not converted into matters of public importance and concern simply because they deal with relationships among individuals employed in a government office. If that were the case, every personnel dispute in a government office would carry with it the seeds of constitutional litigation. *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691; *Ferrara v. Mills,* 781 F.2d 1508, 1516 (11th Cir.1986). Consequently, Kenna's comments at the August 30 meeting do not constitute protected speech. That is to say, the First Amendment does not prohibit his discharge based upon what occurred at that meeting.

### C. *Pickering Balancing*

■ Even if it is assumed, *arguendo,* that Kenna's statements dealt with matters of public concern, it is evident that, in this case, the government's interest in the effective and efficient operation of the United States Attorney's Office outweighed any interest Kenna may have had in making those statements. By August 30, the attorney subpoena issue had been settled.

It had been fully debated both within the United States Attorney's office and throughout the legal community. In addition, it had been discussed in both the First Circuit's published opinion and the article appearing in *Foster's Daily Democrat.* Even Kenna accepted the fact that a policy had been established and that it was Wiebusch's prerogative to do so. In sum, there was no further purpose to be served by reiterating past criticism of that policy.

On the other hand, the government, as an employer, had a legitimate interest in carrying out that policy. *See Roberts v. Van Buren Public Schools,* 773 F.2d 949, 956 (8th Cir.1985). Continuation of the criticism, especially at the acrimonious level it had reached, was threatening implementation of that policy. Moreover, it was seriously eroding the relationship between Wiebusch and his subordinates and impairing the office's ability to function. As previously noted, further argument on the subject had taken on a personal tone that was alienating Wiebusch from the AUSAs and had created an intolerable atmosphere in the office. Under these circumstances, the First Amendment does not insulate Kenna from the consequences of his continuing intransigence.

## II. *The Section 1985(1) Claim*

In addition to his First Amendment and *Bivens* claims, Kenna also asserts that the defendants violated 42 U.S.C. § 1985(1) by conspiring to injure him "in his person or property on account of and while engaged in the lawful discharge of the duties of his office." Conformed complaint ¶ 94. Specifically, Kenna alleges that the defendants conspired to violate his First Amendment rights by "recommending and causing [his] dismissal knowing such action was taken in retaliation" for what he said. *Id.*

To the extent that this count merely seeks to utilize § 1985(1) as a vehicle for recasting Kenna's First Amendment claim, it must be dismissed for reasons already stated. Kenna's comments did not address a matter of public concern. Therefore, they do not constitute constitutionally protected speech for which Kenna's employer was prevented from discharging him. However, to the extent that this count raises an independent claim, further analysis is required.

Title 42 U.S.C. § 1985(1) was originally enacted as a part of the Ku Klux Klan Act of April 20, 1871, ch. 22, § 2, 17 Stat. 13. It provides, in relevant part, as follows:

*(1) Preventing officer from performing his duties.* If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties; ... (3) ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(1), (3).

The purpose of the statute was to protect federal officials responsible for implementing reconstruction in the post Civil War South. However, its reach has been extended well beyond that goal. The Supreme Court has urged that this statute, like other reconstruction era statutes, be given a "sweep as broad as [its] language." *Griffin v. Breckenridge,* 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971). Moreover, in contrast to other civil rights statutes, § 1985 does more than merely provide redress for the violation of other statutory or constitutional rights. It creates substantive rights not found elsewhere. *Mollnow v. Carlton,* 716 F.2d 627, 630–31 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984); *Stern v. United States Gypsum, Inc.,* 547

F. 2d 1329, 1334–36 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *Stith v. Barnwell,* 447 F.Supp. 970, 972–74 (M.D.N.C.1978); *Perry v. Golub,* 400 F.Supp. 409 (N.D.Ala.1975).

Accordingly, in some circumstances, § 1985(1) has been held to permit a federal official to sue a superior who unlawfully conspires to cause his discharge or deny him a promotion. *E.g., Spagnola v. Mathis,* 809 F.2d 16, 29 (D.C.Cir.1986); *Windsor v. The Tennessean,* 719 F.2d 155 (6th Cir. 1983); *Stith v. Barnwell,* 447 F.Supp. 970, 973–74 (M.D.N.C.1978). *See Mollnow v. Carlton,* 716 F.2d 627, 630–31 (9th Cir. 1983). However, that does not transform the statute into a vehicle for challenging every adverse employment decision regarding a federal employee. Permitting AUSAs, in particular, to utilize § 1985(1) to contest terminations would subvert Congress' statutorily expressed intent that they be terminable at will. 28 U.S.C. § 542(b). In this context, § 1985(1) requires a showing that the action in question was designed to "injure [the employee] in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof." [5] The essence of the proscribed conduct is acting with the intent to impede the employee in properly performing his or her official duties. The conspiracy provisions do not extend to terminations or other personnel decisions having a different purpose regardless of how incorrect they may be. Such decisions may be subject to challenge but not under the rubric of § 1985(1).

Kenna relies heavily on *Windsor* which upheld a § 1985(1) claim by an AUSA against a United States Attorney and a local newspaper publisher who conspired to print defamatory articles about the plaintiff for the purpose of obtaining his dismissal. However, in that case, the defendants' purpose was to retaliate for the AUSAs presentation of evidence to a grand jury linking the publisher to criminal activity, an act at the very heart of his official duties.

In the instant case, there is no allegation that Kenna was dismissed for doing anything that constituted part of his official duties as an AUSA. As previously noted, Kenna, himself, attributes his discharge to statements he made that were critical of Wiebusch. Those statements did not deal with Wiebusch's attorney subpoena policy. They were directed at Wiebusch personally and, ironically, at statements made by Wiebusch that Kenna interpreted as critical of him and the other AUSAs.

However, for present purposes, it makes little difference how one construes the object of Kenna's comments. Whether they were aimed at Wiebusch's policies or at Wiebusch personally, Kenna's remarks were not part of the official duties of his office. At best, they were expressions of his opinion regarding the wisdom of policies which he was duty bound to execute. At worst, they were personal criticisms of his immediate superior. In either event, they appear to have been expressed under circumstances and in a manner causing legitimate concern as to whether Kenna's continued presence might impair the office's ability to function effectively. In this context, it is clear that there was no conspiracy to injure Kenna on account of or while engaged in the official duties of his office. Therefore, his claim under § 1985(1) must fail.

### III. *Conclusion*

For all the foregoing reasons, the defendants' motion for summary judgment as to all remaining claims is GRANTED, and the clerk is directed to enter final judgment in favor of all defendants as to all claims asserted and for costs.

IT IS SO ORDERED.

---

**5.** The provisions of § 1985 may also be triggered by a conspiracy motivated by racial animus or invidious discrimination, neither of which is alleged in this case.