Bruce E. KENNA, Plaintiff,

v.

The UNITED STATES DEPARTMENT OF JUSTICE; Edwin Meese, III, as Attorney General; D. Lowell Jensen, as Deputy Attorney General, William P. Tyson, as Director Executive Office for United States Attorneys; Lawrence S. McWhorter, as Deputy Director, Executive Office for United States Attorneys; Susan A. Nellor, as Director, Office of Legal Services, Executive Office for United States Attorneys; and Richard V. Wiebusch, both personally and as United States Attorney for the District of New Hampshire, Defendants.

Civ. A. Nos. R.I.–86–0202T, N.H.–C86–125D.

United States District Court, D. New Hampshire.

Nov. 9, 1989.

Carroll F. Jones, Robert J. Lynn, Ronald L. Snow, Concord, N.H., Raymond J. Kelly, Manchester, N.H., for plaintiff.

Sharon L. Reich, Patrick Sorek, J. Ledbetter, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

TORRES, District Judge.*

This case graphically illustrates the truth of Lord Marmion's lament "Oh! what a tangled web we weave when first we practise to deceive!" [1] It is an action by a former Assistant United States Attorney (AUSA) who seeks reinstatement and damages for what he contends was the wrongful termination of his employment and is presently before the Court on the defendants' motion for sanctions pursuant to Rules 11 and 26(g) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. The motion is based on allegations that the plaintiff and his former counsel made fraudulent claims that required needless discovery and greatly increased the expenses incurred by the defendants in connection with this litigation.

## FACTS

The facts underlying this case are set forth in a separate memorandum and order addressing the defendants' motion for summary judgment. 727 F.Supp. 64. For present purposes, it is sufficient to note that, from 1981 to 1985, Bruce Kenna was an AUSA in the Office of the United States Attorney for the District of New Hampshire. During the last few months of his tenure, Kenna had a number of serious disagreements with Richard Wiebusch, the United States Attorney in charge of that office. As a result, on September 18, 1985, Wiebusch wrote to the Executive Office for the United States Attorney (EOUSA) of the Department of Justice (DOJ) seeking permission to discharge Kenna and detailing the reasons for his request. A summary of those reasons was furnished to Kenna, but EOUSA refused to provide him with a copy of the letter. It finally did so when excerpts mysteriously appeared in two local newspapers on October 31 and November 1, 1985. Eventually, permission to discharge Kenna was granted and his employment was terminated in December of 1985. This suit was commenced in March of 1986.

The motion for sanctions revolves around the publication of Wiebusch's September 18 letter. The original complaint implied that the defendants leaked the letter and suggested that certain due process claims asserted by Kenna were based, at least in part, upon such publication. The defendants vigorously denied any role in the publication and embarked on a course of

---

* Of the District of Rhode Island.

**1.** Sir Walter Scott, "Marmion," Canto VI, Stanza 17 (1808).

discovery to determine the source of the leak. The facts uncovered during that process and as presented during two days of evidentiary hearings before this Court are as follows.

In September of 1985, when Kenna learned that his job was in jeopardy, he engaged attorney Carroll Jones. The strategy they developed to prevent Kenna's termination included exerting pressure on Wiebusch and the DOJ by publicizing the details of the dispute. Initially those efforts were hampered by the fact that Kenna did not have a copy of the September 18 letter. That problem was partially solved in mid-October when two secretaries in Wiebusch's office surreptitiously photocopied his copy and delivered it to Kenna. Kenna, in turn, promptly gave the copy to Jones but cautioned him not to disclose how it was obtained. That left Kenna and Jones with a further problem, namely, how they could publicly respond to statements contained in a letter that they were not supposed to have. Jones solved that problem by leaking the letter to two local newspapers which published excerpts on October 31 and November 1 together with Jones's "responses." Feigning ignorance as to how the media had obtained the letter, Jones then persuaded EOUSA to furnish him with an official copy on the ground that it had become public information.

Kenna acknowledges reading the newspaper articles but denies knowing, until more than two years later, that Jones was responsible for releasing the letter. In fact, Kenna claims that, within a few days after publication, he twice asked Jones how the media had obtained the letter and was told that they had most likely received it from Wiebusch. Jones recalls only one such inquiry but admits telling Kenna that Wiebusch was the likely source of the leak. Jones claims that, in making that statement, he was being facetious and thought Kenna understood that.

The original complaint does not specifically allege that Wiebusch leaked the September 18 letter. However, as previously noted, it implies that the government was responsible for the letter's publication and that some of Kenna's claims were predicated on that contention.[2] Similar innuendoes were contained in a subsequent "conformed complaint."

According to Kenna and Jones, both complaints, like all other documents filed on Kenna's behalf, were drafted by Kenna but signed by Jones. The purpose of this arrangement was to minimize Kenna's legal expenses. Jones claims that he did not read these documents closely before signing and filing them because Kenna was an experienced trial attorney. He further contends that this explains why he signed the complaints even though they conveyed what he knew to be a false impression about the publication of the September letter.

Kenna's professions of ignorance about what Jones had done and Jones's professions of ignorance about what Kenna was alleging in his pleadings appear much less plausible when considered in the context of intervening and subsequent events. In May of 1986, the defendants apparently began to "smell a rat." They filed a motion to dismiss or for summary judgment based, in part, on the absence of any definitive allegation that they had caused publication of the September 18 letter. In their supporting memorandum, they expressed the belief that Jones was responsible for the leak. Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, May 15, 1986, at 19–20. Jones forwarded those documents to Kenna along with a cover note stating, "I think we got them on the 'leaks.'" Kenna, claiming that he attached no significance to that comment, countered with opposing memoranda and a supporting affidavit. In them, he stated that "contrary to the defendants' assertions, the plaintiff *has* alleged dissemination of de-

---

**2.** The original complaint states, "On October 31, 1985, local newspapers in New Hampshire began publishing excerpts from defendant Wiebusch's letter of September 18, 1985." Complaint ¶ 69. This paragraph was incorporated by reference in the due process, first amendment and conspiracy counts of the complaint.

famatory material by the government" [emphasis added] and that he "believe[d] that the government—through one of its representatives—caused publication of that letter." Memorandum in Support of Plaintiff's Response to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, June 11, 1986, at 15; Kenna affidavit, July 14, 1986, ¶ 10. Jones not only signed that memorandum but also argued the motion before Judge Selya to whom this case was then assigned. Furthermore, Kenna was present when the motion was heard and drove from Concord to Providence and back with Jones for the argument. Both men claim that they did not discuss the question of publication because their attention was focused on other issues raised by the defendants' motion.

In any event, Judge Selya dismissed four of the seven counts contained in the complaint but let the remaining counts stand. In so doing, he indicated that the record was not then sufficiently developed to permit summary judgment and directed the plaintiff to file a conformed complaint containing only the three remaining counts. That complaint was filed on January 26, 1987 and repeated the allegations implying that the defendants had leaked the September 18 letter.

Judge Selya's decision opened the floodgates to discovery which included numerous interrogatories and requests for admissions propounded by Kenna to the defendants. Among them were a request that Wiebusch admit that he released the September 18 letter to the press and a series of interrogatories asking for detailed infor-

mation regarding who might have had access to the letter or its contents.[3] Jones signed and served both sets of documents. The defendants responded by deposing three of the AUSAs in the office and a secretary. Jones attended each of those depositions, during which the defendants' counsel asked questions calculated to determine the source of the leak. Jones not only failed to disclose his role but affirmatively added to the deception by, himself, asking questions suggesting that Wiebusch was responsible.[4]

On November 9, 1987 Kenna was deposed and specifically denied any knowledge regarding the leak. The following day, the defendants took the deposition of the secretary who purloined the letter and learned that a copy had been furnished to Kenna. That prompted the defendants to seek to redepose Kenna and submit to him a second set of interrogatories focusing on any information he or Jones might have regarding the leak. When Kenna resisted these efforts, the defendants noticed Jones's deposition and issued a subpoena to him. Jones moved to quash that subpoena, citing the attorney/client privilege. That motion was heard on December 1, 1987. The magistrate hearing it deferred decision but, in the meantime, directed Kenna to answer the second set of interrogatories. Those answers were furnished on December 7. In them, Kenna acknowledged that Jones had leaked the letter but claimed that he did not learn that until December 4, when he was so informed by Jones's attorney.

3. Plaintiff's First Request for Admissions from Defendant Wiebusch, September 1987, at 39. Plaintiff's Second Set of Interrogatories to Defendant Richard Wiebusch, November 18, 1987.

4. For example, Jones asked the following questions of Judith Barrett, the secretary who had furnished Kenna with a copy of the September 18 letter:

Jones: You were working in the office at the time Mr. Wiebusch came on board as U.S. Attorney.
Barrett: Yes, I was.
Q. And it's true, isn't it, that he was often visited by members of the media, both print and television, and that sort of thing in the office.

A. I can remember of couple of occasions, yes.
Q. And he would meet with members of the press in his office.
A. Yes, he would.
Q. And he'd close the door; wouldn't he?
A. Yes, he would.
Q. So you didn't know what they were giving him?
A. No, I did not.
Q. Or what he was giving them.
A. No.
Deposition of Judith Barrett, November 10, 1987 at 40.

Having caught Jones with his hand in the cookie jar and believing that the crumbs on Kenna's fingers came from the same source, the defendants brought this motion for sanctions. Specifically, they seek the sum of $17,127.00 for attorneys fees and expenses attributable to the false claim and prosecution of this motion. In support of their request, they have submitted detailed time records and evidence of payment for the costs they have incurred.

## DISCUSSION

■ Rules 11 and 26(g) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 all provide for monetary assessments against those who engage in various forms of frivolous or vexatious litigation practices. Under Rule 26(g), such assessments may be made to compensate the opposing party· and/or punish the transgressor. Moreover, they may be levied against attorneys and parties alike. However, the rule applies only to abuses of discovery. Section 1927, on the other hand, has a broader reach. It extends to any conduct that unreasonably "multiplies the proceedings." However, it permits sanctions solely against attorneys (or those conducting the litigation) and only to the extent of the excess expenses incurred by an adversary. Rule 11, on the other hand, incorporates the features of both. Like § 1927, it applies to all phases of litigation. Moreover, like Rule 26(g), it provides for compensatory and/or punitive sanctions against attorneys and parties alike. Therefore, while the conduct at issue in this case is potentially within the scope of all three provisions, the Court will focus its analysis on Rule 11.

Rule 11 requires that every document filed on behalf of a party be signed by that party's attorney or, if the party is unrepresented, by the party himself. It states that:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a ... paper is signed in violation of this rule, the court ... shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the ... paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11.

The purpose of the rule is to discourage baseless claims and defenses and other abusive tactics that needlessly increase the cost and duration of litigation. That purpose is effectuated by emphasizing the obligations assumed by participants in the process and by mandating sanctions when those obligations are violated. *Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 604 (1st Cir.1988); Fed.R.Civ.P. 11 advisory committee notes.

■ Prior to 1983, the standard for determining whether a violation had occurred was a subjective one that hinged on whether the attorney or party had acted out of a good faith belief that the action taken was supportable. The 1983 amendments to Rule 11 made two significant changes. First, they imposed an affirmative obligation to conduct a reasonable inquiry regarding the basis for a contemplated claim before it was asserted. That duty is a continuing one that requires that the validity of the claim be reassessed as the litigation progresses. Second, the amendments substituted a more stringent objective test for measuring responsibility. Thus the relevant question is no longer whether the signer subjectively believed that a claim was legitimate. Rather, it is whether a competent attorney (or party), after appropriate investigation, would have reasonably believed that the claim was well grounded in fact and law. *See Kale v. Combined*

*Insurance Co. of America,* 861 F.2d 746, 758 (1st Cir.1988); *Shrock v. Altru Nurses Registry,* 810 F.2d 658, 661–62 (7th Cir. 1987); Fed.R.Civ.P. 11 advisory committee notes.

*Liability of Attorney Jones*

In the instant case, Jones signed all of the relevant documents in his capacity as Kenna's attorney. By virtue of Rule 11, he thereby represented that he had read the documents, that he had conducted a reasonable inquiry into the basis for his client's claims, that, after doing so, he believed those claims to be well grounded in both fact and law and that the claims were not interposed for any improper purpose. At least one of those representations was false. Jones, himself, concedes that he did not carefully read the documents because Kenna, the draftsman, was an experienced trial attorney. That, in itself, is a sufficient basis for imposing sanctions on Jones under Rule 11.

However, Jones's transgressions appear to extend much further. It is difficult to believe that Jones failed to read not only the original complaint but also the defendants' motion for summary judgment, Kenna's response to that motion and the conformed complaint, all of which clearly reveal Kenna's claim that the defendants were responsible for publication of the September 18 letter. Indeed, the note he sent to Kenna (i.e. "I think we got them on the 'leaks.'") when he forwarded the motion for summary judgment clearly indicates his awareness of that claim. Furthermore, it is inconceivable that Jones could have argued that motion without being aware of Kenna's claim since the motion was predicated in part on the contention that the claim was false. Even if Jones was impervious to the contents of the documents he was filing and the arguments of his adversary, any ignorance that the subject was an issue in the case should have been dispelled by the depositions of other AUSAs and secretaries in the office which focused, in part, on the source of the "leak." Instead of setting the record straight, Jones either sat mute or, in one case, asked questions obviously calculated to continue the deception. Thus, it appears that he not only failed to make reasonable inquiry to reassess Kenna's claim but perpetuated it with knowledge that it was false. In short, the Court finds that Jones's violations of Rule 11 go well beyond a failure to carefully read the documents he signed. In any event, he is clearly subject to sanctions under the rule.

*Liability of Kenna*

As previously stated, liability for sanctions under Rule 11 extends to parties as well as attorneys. When a party signs a document, liability may be predicated on breach of the certification that the rule deems the "signer" to have made. In providing sanctions against "the person who signed" the document, the rule makes no distinction between the signature of an attorney and that of a party. Furthermore, a party's signature is not the only basis for imposing liability on that party. Even a party who is represented by counsel and who does not sign the offending document may be penalized. Rule 11 provides that if a document is signed in violation of its strictures, sanctions may be imposed against "the person who signed it, *a represented party, or both.*" Fed.R.Civ.P. 11 [emphasis added].

A court has considerable discretion to determine how liability should be allocated between a party and the party's attorney. In exercising that discretion, the court should assess the relative responsibility of each for the violation and the harm caused. *See Muthig v. Brant Point Nantucket, Inc.,* 838 F.2d 600, 607 (1st Cir. 1988); *Chevron, U.S.A. v. Hand,* 763 F.2d 1184, 1187 (10th Cir.1985); *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1178–79 (D.C. Cir.1985). Consequently, a party should bear sole responsibility when that party deceives counsel into erroneously believing that there is a basis for the claim asserted. Similarly, a party who colludes with counsel in presenting a claim that the party knows lacks merit should be held jointly accountable for the consequences. Shared responsibility should also attach to a party who permits the assertion of a claim that

such party reasonably should have known to be groundless.

In measuring the quantum of knowledge imputed to a party, an objective test should be utilized. Of course, in some respects, the standard for determining whether a party reasonably should have known if the claim were meritorious ought to be less stringent than that applied to counsel. Thus, it would be patently unjust to expect a lay party to exercise the same level of judgment as a trained attorney regarding the *legal* basis for a claim. In such cases, the standard employed should be that of a reasonable person of similar background. On the other hand, when the issue is whether a claim is well grounded in *fact*, a lay party may have superior knowledge and, therefore, should be held to the same standard as counsel or perhaps a more stringent one.

■ In this case, it makes no difference whether the focus is on what Kenna actually knew about the basis for his claim or what he reasonably should have known. In either event, the result is the same. It is difficult to believe that Kenna did not learn the source of the leak until December 4, 1987. From the outset, his strategy included publicizing the details of the dispute, and he was well aware of Jones's frequent contact with the media in furtherance of that strategy. Furthermore, he delivered a copy of the September 18 letter to Jones knowing that Jones could not use it unless it could be made public information without disclosure of the source from which it was obtained. Indeed, a few days later the letter did, in fact, appear in the newspaper.

It is also hard to accept that Kenna would have drafted the complaint and presented it to Jones without discussing the contents with him. This is particularly true in light of the fact that the allegations regarding the leak were important to some of his claims. If Kenna truly believed that the defendants were the source of those leaks, it would be reasonable to expect that he would have talked to Jones about how they could gather proof of those charges. Another indication of Kenna's knowledge is

the carefully hedged wording of the complaint which strongly implies but falls just short of literally alleging that the defendants leaked the letter.

Even more troubling is Kenna's receipt of the defendant's motion for summary judgment accusing Jones of responsibility for the leak and Jones's accompanying note stating "I think we·got them on the leaks." That measure can only be construed as an expression of satisfaction that the deception was having its intended effect. If Wiebusch had been responsible for the leak, the defendants could hardly be expected to have taken the position they did. Added to that is the fact that Kenna and Jones rode together to Providence for argument on that motion which was based, in part, on the sufficiency of Kenna's allegations regarding the leaks. It strains credulity to believe that, despite all of that, they never discussed the subject.

The coup de grâce was the fierce resistance by both Kenna and Jones to the defendants' efforts to question them regarding the leaks after learning that a copy of the September 18 letter had been illicitly furnished to Kenna.

Even if one believed that Kenna did not *actually* learn of the deception for more than two years, the inescapable conclusion is that he reasonably *should* have known. Thus, accepting at face value Kenna's assertion that he sincerely interpreted Jones's response to his November 1985 inquiry to be a denial of responsibility for the leaks, the events previously recounted should have alerted any reasonable person that something was amiss and prompted further inquiry. Since Kenna did not at least do that, he cannot evade responsibility under Rule 11.

*Sanctions*

■ Having determined that sanctions should be borne jointly by both Jones and Kenna, the only remaining issue is the nature and amount of those sanctions. Rule 11 specifically contemplates that sanctions include "an order to pay to the other ... parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a

reasonable attorney's fee." Fed.R.Civ.P. 11. Here, the defendants' representations fix that figure at $17,127.00. Therefore, the defendants' motion for sanctions is granted, and it is hereby ordered that Jones and Kenna jointly and severally pay that sum to the defendants within thirty days. In addition, the clerk is directed to forward a copy of this Memorandum and Order to the New Hampshire Supreme Court Committee on Professional Conduct for whatever action it may deem appropriate.

IT IS SO ORDERED.